JEREMIAH T. CAREY, Individually and as President of the International Brotherhood of Paper Makers, and EDWARD BROCKWAY, on Behalf of Himself and All Other Members of the International Brotherhood of Paper Makers, Plaintiffs, *v.* INTERNATIONAL BROTHERHOOD OF PAPER MAKERS, JOSEPH LAUERMAN, FRANCIS ADDY, JOHN TRACEY, JAMES McCUE, Individually and as Members of the International Brotherhood of Paper Makers, MATTHEW H. PARKER, MATTHEW J. BURNS, HENRY GROSSE, DOMINICK McDERMOTT, as Treasurer of the International Brotherhood of Paper Makers, Defendants.

Supreme Court, Jefferson Special Term, September 20, 1924.

Labor unions — election of officers — action to set aside report of board of canvassers of International Brotherhood of Paper Makers and to restrain candidate declared elected president from performing duties and receiving salary — canvass indicated candidate declared elected received majority of votes lawfully cast at annual election — court will not intervene in affairs of voluntary association until provisions of constitution and by-laws are violated — court will not interfere with determination of quasi-judicial tribunal, set up to pass upon questions arising within association, unless bad faith or fraud is shown — candidates bound by findings of canvassing board in absence of proof of fraud or bad faith — salary of prospective public office is not property right — property right involved by reason of question concerning right to employment — action of canvassing board final, complaint dismissed and temporary injunction dissolved.

Where civil or property rights in the affairs of voluntary associations are involved and are determined according to the rules and regulations of the association,

in the absence of a question affecting public policy, the court will not intervene because the constitution and by-laws of the association constitute the contract between the association and the members thereof. Until the provisions of the constitution and by-laws are violated, there is no ground upon which to invoke the jurisdiction of the court. Neither will the court interfere with the determination of a *quasi*-judicial tribunal set up by the association to pass upon questions arising within the association unless bad faith or fraudulent purpose in its conduct in passing upon the particular questions is found as a matter of fact.

Accordingly, plaintiff's action to set aside the report of the board of canvassers of the International Brotherhood of Paper Makers declaring said plaintiff defeated for the office of president of the international union, and to declare said plaintiff elected as president and to restrain the candidate declared elected president from performing his duties and receiving the salary of the office, will be dismissed and the temporary injunction heretofore granted dissolved, where the proof does not warrant a finding of fraud or bad faith on the part of the canvassing board, and it is clear that the candidate declared elected did receive a majority of the votes legally cast at the annual election, since candidates are bound by the action of the canvassing board, acting in a *quasi*-judicial capacity, in the absence of proof of bad faith or fraud in the performance of its official duties.

The salary attached to a prospective public office is not a property right until after the election.

*It seems,* that a question involving the right to employment involves a property right, where the question is whether or not the contract of employment was actually made.

ACTION to set aside the report of the international board of canvassers of the International Brotherhood of Paper Makers, for the recanvass by the court of ballots cast by the members of such brotherhood at the election held in October, 1923, and for judicial declaration that the plaintiff was elected at such election to the office of president of said International Brotherhood of Paper Makers for the term of two years commencing January 1, 1924, and for an injunction restraining Matthew H. Parker, declared elected president by said canvassing board, from performing the duties of president of said International Brotherhood of Paper Makers and from receiving the salary fixed for such purpose, and to declare the said plaintiff elected at said election as a delegate to the American Federation of Labor convention, and for such other relief as may be just, equitable and proper.

*Conboy & Hendricks (A. W. Pitkin, of counsel), for the plaintiff.*

*Morris Hillquit, for the defendants.*

SMITH, J. The International Brotherhood of Paper Makers is a voluntary unincorporated association of paper makers organized for the mutual benefit of its members and consists of many so-called " locals " organized and existing under the International Brotherhood of Paper Makers in many states of the United States and in Canada. There are some 200 locals of said brotherhood listed. The organization has a constitution, by-laws, standing rules and

general laws adopted by it, regulating its affairs and government, and under it these locals are organized, receiving their charters from the International Brotherhood of Paper Makers, and are subject to its jurisdiction.

The international officers are elected by a referendum vote of the members of the brotherhood under rules and regulations set forth in the constitution, by-laws, etc. According to these rules elections are to be held between the first and fifteenth days of October, both inclusive, every two years, and it is the election held in October, 1923, which is under consideration here. The constitution provides that elections be held in the various locals " at a regular or well advertised special meeting called for that purpose;" that for the purpose of the election, each local shall select three inspectors of election at the meeting of the local preceding the meeting when the election is to be held; the international secretary supplies the ballots, registration sheets and tally sheets to the various locals; only those in good standing at the time of the voting are entitled to vote; a copy of the registration sheets and a copy of the tally sheets and the ballots are to be transmitted to the international secretary in care of the international canvassing board under registered mail within twenty-four hours after the election. There is provision for voting by headquarters' members and for furnishing ballots to absentee voters attached to locals. The international canvassing board consists of three members who are selected one each by three locals designated for such purpose by the executive board of the International Brotherhood. There are provisions in the constitution governing the action of the international canvassing board. The international canvassing board organizes by selecting one of their number as chairman. It is their duty formally and in the presence of each other to open the envelopes or boxes containing the votes, tally sheets, registration sheets, and ascertain and verify the results of the election, and upon the conclusion of their labors, to prepare a detailed report of the results of the voting and sign the same to be submitted to each member of the executive board; and it is the duty of the international secretary of the organization to forward a copy of the same to each local, and to publish the report in the next issue of the official journal of the organization. The canvassing board on the completion of its labors shall place the registration sheets, tally sheets and ballots under lock and key for safekeeping where they are to remain until the succeeding convention when they shall be disposed of. The rules provide that a candidate for office or his representative may be present at the tabulation of the referendum vote, and that whenever there are

more than two candidates for office and none receives a majority of all the votes cast, the international secretary shall as soon as possible, not later than November fifteenth, submit another ballot containing only the names of the two candidates receiving the highest number of ballots cast between October first and fifteenth, both inclusive, the names of all other candidates to be dropped.

It is apparent from the reading of these rules that while the result of the election is determined by the votes of the individual members of the organization rather than by the vote of the locals acting as a unit, yet the autonomy of the local is recognized in that the elections can only be held at a meeting of it. No votes of members can be counted except they be cast at a meeting of such local, excepting votes by members who are not attached to any local, such as headquarters members. The point is that while each member has a right to vote, he can only vote at a meeting of his local. This feature is of more importance than at first blush it would appear. There are several reasons — the element of notice; every member of a local is chargeable with notice of regular meetings; second, the element of the meeting itself, where the members of the local gather and discuss the problems of the local, or of the general organization itself and where the merits or peculiar qualities of candidates may be considered and an expression of the views of members may be had; in other words, where there could be a fair and free discussion of the situation raised by the election or raised by any question submitted to the members by referendum vote. So that while the member's vote is counted individually, his right and power to vote is limited to a meeting of the local. If his local fails to meet, he loses his vote. If his local fails to select inspectors of election, he cannot vote. If the local officers fail to distribute ballots to absentee members, it is the local's fault. Undoubtedly a local officer could be punished for failure to perform duties by disciplinary rules of the organization, but the individual would lose his right to vote through the failure of the local to comply with the regulations. Severe penalties are provided in case local inspectors or the international canvassing board fail to perform their respective duties.

It happens in this election that out of about 200 locals listed, less than 100 locals forwarded ballots cast at the election. The record in the case is free from any evidence of bad faith on the part of the members of any local or on the part of the officers of any local.

In the election held in October, 1923, Jeremiah T. Carey, who had for some eighteen years been the president of the International Brotherhood of Paper Makers, Matthew H. Parker and Henry Grosse were candidates for the office of president of the Inter-

national Brotherhood of Paper Makers, and Mr. Carey and Mr. Parker were candidates for delegates to the American Federation of Labor convention. It is charged in the complaint that certain parties, including Mr. Parker and members of the brotherhood, entered into a conspiracy to defeat the plaintiff, Mr. Carey, in the election by unlawful means. There is not a scintilla of evidence in the case that up to the time of the meeting of the international canvassing board there was any conduct in the election tending to show conspiracy as charged; there was a hotly contested election in which Mr. Carey and Mr. Parker were the chief contestants. It is true that the rules and regulations adopted by the International Brotherhood as to elections are far from complete. They are general, and undoubtedly it was expected that under these general rules and in accordance with them, the executive board would prepare and distribute to the locals detailed instructions advising as to and interpreting the rules in accordance with the spirit and letter, particularly with respect to the ballot and how the voting should be held. In fact it appears that the brotherhood had in convention provided for this very procedure. Unfortunately this does not seem to have been done with any great thoroughness, although the international secretary prior to the election did send out a letter of instructions with the knowledge and consent of the president setting forth the rules which should govern the election, but not with such completeness as to anticipate the difficulties which subsequently arose before the international canvassing board. Most of the troubles encountered by this board would have been avoided had proper regulations been adopted by the executive board and distributed to the various locals to guide them in the voting.

A ballot was prepared and distributed to the locals defective in some respects, but no instructions were given as to how the ballot should be marked and no rules laid down to the effect that a certain marking would void the ballot. It was well within the authority of the executive board to establish general rules not in conflict with the provisions adopted by the constitution, by-laws, etc., of the organization to guide the locals and the members. Some of the instructions sent out by the secretary were actually in conflict with the provisions of the constitution, showing that no great care had been exercised in the preparation of the letter of instructions. These, however, had no effect upon the election and were disregarded by the canvassing board.

Under such circumstances the international canvassing board met at the place designated at the headquarters of the organization in the city of Albany, N. Y., for the purpose of canvassing the vote and commenced its labors on or about the nineteenth of

October, and such were the difficulties encountered that it did not complete its labors until the nineteenth of November following.

The record shows that the canvassing board acted with due diligence on the problems submitted to it. Immediately upon convening it opened the ballots on hand, checked up the registration sheets with the financial reports in the headquarters, and where it was discovered that persons who had voted in the locals were not in good standing, withdrew the number of ballots to correspond with those found not to be in good standing and then counted the vote of the local. Its first work was confined strictly to determining the number of qualified votes cast and to drawing from the ballots of each local the number of votes cast by those not in good standing. No question is raised as to the fairness of the canvassing board in this respect; nor do I think any can be raised. While it was engaged in this process certain protests were received but it was decided to proceed with the work of tabulating the votes along the lines above indicated and to listen to all protests which might be received at one time.

Upon such tabulation, which apparently was never footed by the canvassing board, it appears that Mr. Carey received 1,423 votes, Mr. Parker 1,129 votes and Mr. Grosse 152 votes; in addition to these votes listed upon the tabulation sheet, there were received and properly counted the votes of Local Chateaugay No. 8, Carey 12 votes, Parker none, Grosse none; of Local Powell River, No. 142, Carey 8, Parker 19, Grosse 1, and of Local Espanola No. 156, Carey 9, Parker 87, and Grosse 1, making a total of the ballots of members in good standing, irrespective of protests cast, as follows: Carey 1,452, Parker 1,239 and Grosse 154; so that on the face of the returns, and before the consideration of any protests, Mr. Carey had a majority of sixty-three votes.

Such was the situation when the international canvassing board met on the thirty-first of October for the purpose of considering the protests which had been filed. The board listed protests filed as follows: Protests against the vote by Local No. 1, Holyoke, Mass.; Local No. 5, Bellows Falls, Vt.; Local No. 176, Lincoln, N. H., on the ground that the votes of these locals were taken on different days, not at one meeting regular or special. There is evidence that Mr. Carey protested the vote of Local No. 28, Ft. Edward, N. Y., on this ground, although the official record of his protest was upon the ground that of the twenty-one members who voted at the election of that local, only fourteen were qualified voters. There was a protest against Local Holyoke 169 (should be Magazine); against Local 52, Kalamazoo, Mich., and against Local 107, Neenah, Wis., on the ground that there was no meeting,

there being no quorum present.   The vote of Local Troy No. 17 was protested on the ground that the vote was cast under duress. There was a protest against one vote cast in Local No. 7, Palmers Falls, N. Y., on the ground that at least one vote cast at the election was handled by a man not a member of the organization. There was a protest against counting certain ballots not marked in the squares opposite the candidates' names, or where the mark in that section shows an erasure or attempt to remark the vote. There was a protest by Mr. Parker against the action of the canvassing board in cases where the returns of locals showed a surplus of votes beyond the number lawfully entitled to vote in disposing of the surplus by drawing by lot the particular ballots in order to bring the total down to the number which should have been cast, and against the destruction of such withdrawn ballots.

Having listed these protests the board proceeded to consider the evidence and the arguments with respect to each, and for such purpose met on October thirty-first, and continued the hearings until one o'clock P. M. on November second, at which time the hearing on the protests was ended, and the meeting adjourned until the following morning at nine o'clock and notice was given that the watchers were privileged to meet with the board to observe its conduct in determining the questions raised.   Stenographic minutes were kept of these protests and the hearings upon them had.

No objection or criticism is made that the board did not offer a full and fair hearing on every question raised before it.   No question was raised as to the right to file protests or as to the duty of the canvassing board to consider them.   The board did not complete its labors and reach its final determination or make its report until November 19, 1923, at which time in due form it made its report of the canvass to the executive board of the International Brotherhood of Paper Makers, by which it appears that Mr. Parker received 1,151 votes, Mr. Carey 941 votes, and Mr. Grosse 150 votes for the office of president, and that Mr. Parker having received the majority of all the votes cast was declared elected.

Mr. Parker and his friends might have taken the position that, in view of the apparent election of Mr. Carey as shown on the face of the returns, they would abide by this result, and if no protests had been filed, undoubtedly the result would have been as indicated by the face of the returns.   But Mr. Parker was well within his rights, and all entitled to protest were well within their rights, in insisting that no votes excepting such as were cast in accordance with the rules and regulations by members entitled to vote in accordance therewith should be counted.

Such great lengths have been gone to in the consideration of the

facts of the case because of the importance of this matter to the International Brotherhood of Paper Makers, and in order to determine what the actual situation was irrespective of questions of jurisdiction of the court or the rules of law governing the right to invoke the powers of a court of equity to review the conduct of voluntary associations. It is clear that a majority of all the votes lawfully cast at the election of October, 1923, was cast for Matthew M. Parker for president of the International Brotherhood of Paper Makers. So much for the facts.

Aside from these there are very cogent reasons why the complaint of the plaintiff should be dismissed. The court will intervene in the affairs of voluntary associations when civil or property rights are involved, but where such rights are involved and are determined according to the rules and regulations of the association (there being no question of public policy involved) the court will not intervene, on the theory that the constitution and by-laws of the association constitute the contract between the association and the members of it, and that until their provisions are violated, there is no ground upon which to invoke the jurisdiction of the court. Furthermore where under the rules and regulations governing the association, a tribunal has been set up to pass upon questions arising within the association, the court will not interfere with the determination of such a *quasi*-judicial tribunal set up by the organization unless bad faith or fraudulent purpose in its conduct in passing upon the particular question is found as a matter of fact.

The constitution of the International Brotherhood of Paper Makers attached to the office of president a salary of $5,000 per annum, and it is contended on the part of the plaintiff that a property right is, therefore, involved. The holdings of the courts are uniform to the effect that the salary attached to a public office is not a property right. If there is any property right at all, it would not ripen except as a result of the election. If an officer were elected and became entitled to his salary, he would have a right to collect it as earned; this would be a property right. Mr. Carey's term of office as president expired December 31, 1923, and his right to salary terminated on that date; any right to any subsequent salary depended upon whether he was re-elected president; it has likewise been held as to ministers of the churches that the salary attendant upon the office is not a property right; salaries do not pass to one's next of kin and are not assignable. They depend upon services rendered, so that the argument to establish a property right upon this ground is without foundation.

There is, however, a basis for a contention not made by counsel that a property right is here involved. The rules and regulations

of the International Brotherhood of Paper Makers constitute a contract between it and each member of the brotherhood governing any property rights which may exist; they constitute a contract with each candidate running for office that the election will be conducted in accordance therewith in the determination of the question as to which candidate the International Brotherhood of Paper Makers would employ in the office of president for the ensuing two years at the salary of $5,000 per annum fixed in the constitution. Can it be said that the question as to whether one person or another should be entitled to the right to earn a livelihood by acting as president of the brotherhood did not constitute a property right? Is there not a distinction to be made between the cases cited as to public office, and the cases of the ministry where a right to hold office is subject to the regulations governing the church and is not for a definite period? It is clearly established as a part of the law of contract that one employed for a definite period may not, excepting in accordance with the terms of the contract, or for reasons recognized by the law, be discharged from an employment without making the employer liable with certain limitations for the compensation for the full term of the employment. I know of no case where the question in this form has arisen, but it seems to me to go a little too far to hold that a question involving the right to employment does not involve a property right where the question is whether or not the contract of employment was actually made.

In any event the candidates for election were bound by the action of the international canvassing board, acting as it does in a *quasi*-judicial capacity, unless it be shown that there was bad faith or fraud in the performance of its official duties. The plaintiff on the charge of fraud or bad faith failed to sustain the burden of proof which rested upon him in this respect. Careful examination has been made of the action of the board of canvassers and of the facts as presented, and where as above shown it appears to the satisfaction of the court that the rulings of the board as to a sufficient number of cases to support its report to the effect that Mr. Parker was elected president, were in accordance with the rules and regulations governing their actions, the court would scarcely be justified in making a finding of fraud or bad faith because in a few instances of minor importance, as to some of which the court is not in possession of all the facts which affected the minds of the members of the canvassing board, might think that it adopted a wrong conclusion especially where these instances would not affect the general result. They certainly do not justify a finding of fraud or bad faith.

No question has been raised by any party as to the jurisdiction of the Supreme Court of the state of New York in an action affecting the conduct of persons and parties, citizens of so many different states and of a foreign country. Jurisdiction not inherent in the court cannot be conferred by consent of parties. Grave jurisdictional questions which are obvious and certainly render the jurisdiction of the court, except to a limited extent, dubious are not here considered because the view here taken renders the consideration of them unnecessary.

The action of the international canvassing board was final. From this action there was no appeal provided for in the rules governing the International Brotherhood of Paper Makers. If any rights of the plaintiff had been invaded, all remedies had been exhausted within the brotherhood and he had no adequate remedy at law so that in this respect the action was properly brought.

The same decision and for the same reasons apply to the election of delegates to the convention of the American Federation of Labor.

The complaint of the plaintiff should be dismissed and the temporary injunction granted herein dissolved, with one bill of costs to the defendants against the plaintiff Jeremiah T. Carey. The counsel for defendants will prepare findings of fact and conclusions of law in accordance herewith to be settled if not agreed upon on five days' notice.

Decreed accordingly. _____