## UNITED STATES v. WEIRTON STEEL CO.
### No. 1060.

District Court, D. Delaware.

May 29, 1934.

Frank K. Nebeker, James Lawrence Fly, and Milton Handler, Sp. Assts. to Atty. Gen., and Leonard E. Wales, U. S. Atty., of Wilmington, Del., for the United States.

Robert H. Richards and Caleb S. Layton (of Richards, Layton & Finger), both of Wilmington, Del., and Earl F. Reed (of Thorp, Bostwick, Reed & Armstrong), of Pittsburgh, Pa., for defendant.

NIELDS, District Judge.

This is a motion for preliminary injunction heard on bill, answer, affidavits, and exhibits in an equity suit brought by the United States against Weirton Steel Company. Pending final determination of the cause the bill prays for an order restraining defendant from violating the labor section of the Code of Fair Competition for the Iron and Steel Industry, approved by the President August 19, 1933, through the means described in the bill of complaint or otherwise.

Jurisdiction of the suit is conferred by section 3(c) of title 1 of the National Industrial Recovery Act (15 USCA § 703(c):

"Sec. 3 (c) The several district courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of any code of fair competition approved under this chapter; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations."

The Code of Fair Competition for the Iron and Steel Industry, approved under title 1 of the National Industrial Recovery Act, provides in article 4, § 1:

"(1) That employees shall have the right to organize and bargain collectively through representatives of their own choosing, and shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or·in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection;

"(2) That no employee and no one seeking employment shall be required as a condition of employment to join any company union or to refrain from joining, organizing, or assisting a labor organization of his own choosing;"

The National Industrial Recovery Act, § 7(a), 15 USCA § 707(a), prescribes as conditions of every code of fair competition the above recited paragraphs.

[1]The bill avers that the steel code was proposed by the American Iron and Steel Institute representing 95 per cent. of that industry, including defendant, and that E. T. Weir, chairman of the board of directors of defendant and a director of the Institute, participated in formulating the code. On July 14, 1933, defendant became a party to the code. That "defendant's plants are an integral part of a stream of commerce originating with the mining of coal, iron ore, and

[1] In this opinion the Amalgamated Association of Iron, Steel and Tin Workers of North America will be referred to as "Amalgamated Union" and the organization under the Plan of Employee Representation in plants of defendant as "Company Union."

other raw products in various states, which are shipped across state lines to defendant's plants to be processed, and which, as processed, are shipped across state lines and delivered, all in the current of interstate commerce, to defendant's customers at their factories where finished products are fabricated therefrom." That the business of defendant is dependent in large measure upon its ability to produce and ship its products without obstruction or delay and therefore obstruction of production directly obstructs transportation and delivery and thereby restrains the flow of interstate commerce and tends to diminish the amount thereof.

The bill further avers "during the month of June, 1933, defendant, in anticipation of the adoption of the Code, initiated, organized, and imposed upon its employees and at all times since has maintained and controlled the activities of a company dominated union organized under the plan of employee representation, formulated by defendant. * * * Said company union plan is wholly ineffective as a means of collective bargaining, and through it and by means thereof, defendant has interfered with the employees' right of collective bargaining, and their right freely to select representatives and to organize, join, and maintain their own union."

The bill further avers that "in July, 1933, a substantial number of defendant's employees joined a certain union known as the Amalgamated Association of Iron, Steel and Tin Workers and sought through said Union to exercise the rights conferred by the above-quoted provisions of the Code, but defendant has continuously refused to recognize the representatives of such employees as so or otherwise selected. As a direct result of all of the activities of defendant alleged in this and the preceding paragraph hereof, and of dissatisfaction of the employees resulting therefrom, a strike occurred at defendant's plants on or about September 26, 1933. Thereupon the defendant closed down its plants for a period of three weeks. * * * As a result thereof the ordinary flow of interstate commerce in such products was substantially obstructed."

Certain employees of the Amalgamated Union, according to the bill, appealed to the National Labor Board "to compose and mediate the dispute." That on October 16, 1933, the National Labor Board conducted a hearing at which defendant and representatives of the striking employees were present. At the conclusion of the hearing the defendant, a representative of the striking employees, and the chairman of the National Labor Board entered into the agreement hereinafter set out.

The bill further avers that "defendant itself prescribed and arbitrarily imposed the methods and procedure for the election. Defendant refused to permit the National Labor Board to conduct the election, denied representatives of the National Labor Board access to company property, refused to post notices of election prepared by the Board, declined to furnish lists of employees, and repudiated the agreement, and thereby interfered with the designation of the representatives of the employees' own choosing."

The bill further avers that "in order to force support of the company dominated union and to defeat the right of the employees to organize and bargain collectively through representatives of their own choosing, defendant employed various measures of coercion, intimidation, and interference, including discharges, lay-offs, demotions, and changes in conditions of employment, and threats thereof; it threatened the closing of plants, the transfer of work, and the reduction of operations. * * * The management engaged in individual and collective solicitation and urging, held mass meetings, gave special inducements, and made coercive speeches; it engaged in misrepresentation and espionage."

The bill further avers that in February, 1934, defendant's employees requested the National Labor Board to hold an election and the board was planning to conduct such election. "Defendant nevertheless continued its policy of obstructing efforts to procure a fair election, again refused to permit Board representatives to enter upon company premises, again declined to furnish identification lists of employees, which lists are essential to the conduct of a fair election, and announced it would not recognize or deal with any representatives of its employees, except those claimed by it to have been elected in the December elections. Meanwhile it has threatened the discharge of all employees who signed election petitions or who participated in any poll conducted by the National Labor Board. At the date hereof the defendant is continuing the activities in this bill complained of, is threatening to continue them in the future and is defeating the right of the employees to organize and to bargain collectively."

Defendant owns and operates three plants for the manufacture of iron, steel, and tin products. They are located at Weir-

ton, W. Va.; Clarksburg, W. Va.; and Steubenville, Ohio; with executive offices at Pittsburgh and Cleveland. The plant at Weirton is the largest, employing in addition to executives about 9,500 persons. The one at Steubenville, just across the river from Weirton, employs about 1,200, and the Clarksburg plant about 1,000. A substantial number of these employees are foreign born including Italians, Greeks, Slavs, Scandinavians, and Poles. Defendant does not own or operate any mines or mining property for the production of raw materials used in the operation of its business. It purchases coal, ore, and scrap material in manufacturing its iron, steel, and tin products. The greater part of the raw material is delivered across state lines to the plants of defendant. Defendant sells its finished products to customers in other states. Raw materials are acquired in advance of actual needs and stored in sufficient quantities to meet estimated requirements over an indefinite period of time. Defendant's process of manufacture is normally conducted in two stages. It uses the raw material in producing ingots, billets, and bars which are stored at Weirton. The second stage of the manufacturing process is the fabrication of these ingots, billets, and bars into finished products at the three plants according to specifications and pursuant to orders received. Generally speaking, the manufactured products are: Tin plate used by purchasers in the manufacture of tin cans, bottle caps, tobacco boxes, buckets, etc.; steel products such as I-beams, channel iron, angle iron, tie plates, and railroad spikes used in the construction of bridges, buildings, and railroads; strip and sheet steel for shipment to automobile manufacturers. Defendant's business requires extensive plants and the use of elaborate equipment. Its plants are divided into numerous departments, including open hearth and blast furnaces, tin plate, strip steel, sheet steel, and blooming mills, with annealing departments, assorting rooms, boiler houses, and a system of railroad tracks. The mills have operated uninterruptedly for upwards of twenty years. During the recent depression the mills operated at a much higher percentage of capacity than other mills in the steel industry. Employees have received wages equal to or greater than those paid by any other steel company.

In May, 1933, Weir, chairman of the board of defendant, visited Eugene G. Grace, president of Bethlehem Steel Company, and obtained from him the plan of employee representation which had been in successful operation at the Bethlehem plants for upwards of fourteen years without labor disturbances. Weir delivered copies of this plan to Williams, president of defendant, for submission to the employees of the Weirton plants. For upwards of eight years there had been an organization in Weirton called the "Employees' Relief and Beneficial Association," composed of employees and affording financial aid under certain circumstances. Defendant submitted the above plan of employee representation to the twenty-three directors of the Relief Association for their consideration. These directors consulted with former directors of the Relief Association and discussed it with groups of employees. Later on, committees were formed by the employees, election boards were organized, and the plan was put into effect.

Defendant printed and distributed over 12,000 copies of the plan among its employees so that each employee received one. The object of the plan was stated on the title page:

"In order to give the employees of the Weirton Steel Company, a voice in regard to the conditions under which they labor, and to provide more effective communication and means of contact between the Management and Employees on matters pertaining to industrial relations, the following plan of Employee Representation has been adopted."

Forty-nine was determined as the total number of representatives, being one representative for each 200 employees. The 49 were apportioned as follows: At the Weirton plant—11 to the tin plate department, 12 to the steel works department, 11 to the strip steel department, and 5 to the sheet mill department; 5 to the Steubenville plant; and 5 to the Clarksburg plant. Election committees of employees were organized and the first election was held in June, 1933. The 49 representatives were elected to serve until December. Of the 11,190 employees eligible to vote 9,866 voted. There is no evidence of dissent or objection on the part of employees at the time of the adoption of the plan and the first election thereunder.

Little appears in the record as to the happenings at defendant's plants from July until September, 1933. For years it had been the company practice to begin weekly operations in its tin mill at Weirton at 12:01 Monday morning. On Sunday, September 24, without any previous warning or demand, 39 men out of a total of 91 employed in the tin plate cold roll department failed to report for work at midnight. Investigation reveal-

ed that a group of 3 or 4 workers stationed at the mill entrance persuaded these 39 men not to go to work. The next two crews went to work as usual. The following night the 39 who had remained away from work entered the mill and demanded that the 52 who had worked the night before be discharged. This demand was refused by the foreman. The 39 then stationed themselves at the entrance to the mill and persuaded other employees not to work. Certain parts of the mill were completely tied up. The strikers organized pickets. A group of about 300 men gathered in a narrow street blocking the main entrance to the tin mill. By Wednesday night operations were so crippled that the plant was shut down.

No reason for the strike was given at the time. There had been no dispute between the company and the men. No vote had been taken by the employees to strike. A committee was formed of employees of the three plants who were members of the Amalgamated Union. William J. Long was chosen chairman. A day or two after the strike started, Long asked representatives of the management to meet his committee. A meeting was held. Long states: "We asked for union recognition." Representatives of the company replied that it was not within their power to grant union recognition in the absence of the president of the company, but they would make arrangements for the committee to meet the chairman of the board. When the committee went to Weir, they were accompanied by Miller, an International vice president of the Amalgamated Union. Weir declined to discuss matters with Miller and the committee. Thereupon Long appealed to the National Labor Board.

Shortly afterwards employees at the plants requested the management to give them an opportunity to work. September 29, 1933, every employee received a letter from defendant stating:

"We have never employed or discharged a man because of his organization connections and our company will never make it a requirement of any employee that he belong to any organization, or that he does not belong to any organization. We believe that it is better for the company and the employees that the latter have their own organization within the company but we have never made that a requirement of employment with us and do not intend to do so. No employee will be discharged because of his failure to join any organization."

Following the letter Weir met with groups of employees in an effort to determine whether there was a grievance behind the strike. Failing to find any Weir decided to open the plants and to offer work to all who desired it. October 3, 1933, each employee received this notice:

"To the Employees of the Weirton Steel Company:

"After conferences with committees of our employees, we are convinced that the strike in our mills was instigated and is being maintained by only a small percentage of our employees, and that the vast majority of them wish to return to work.

"The Weirton Steel Company has made no change in its policy—it will make no contract with the Amalgamated Association of Iron, Steel and Tin Workers, and there is no such requirement in the Steel Code, the NRA or the President's Recovery Program.

"We are co-operating in every way with the President's Program for re-employment, and fulfilling our obligations under the NRA and Steel Code, and we believe it our duty to open our mills and operate them with our own employees. You are not required to belong to any Union.

"Notices will be posted of the time of returning to work.

"Weirton Steel Company,
"E. T. Weir."

October 10, the mills were opened. October 11, the chairman of the National Labor Board telegraphed the defendant:

"In the matter of the strike at Weirton Steel Company, National Labor Board recommend that strike be called off, strikers be taken back without discrimination and all matters in dispute be submitted to Board for decision. * * *"

Weir replied:

"* * * The strike leaders started the strike without having made any demands upon the company or without any notice to us and we can not consider any reference or arbitration until the men return to work. The mills are operating now nearly five thousand men being at work, all regular employees. We will take back all of our former employees if they report to work promptly."

October 14, the chairman of the National Labor Board again telegraphed:

"National Labor Board pursuant to authority invested in it by the President have assumed jurisdiction over the strike at the Weirton Steel Company, Weirton, West Virginia. Hearing will be held Monday, October 16, at 2:00 P. M., Room 7064, Com-

merce Building, Washington. Board request company send authorized representative, would appreciate your coming personally."

October 16, Weir and several of the striking employees, including Long, their chairman, appeared before the National Labor Board at Washington. Chairman Wagner requested Long to "tell your side of the situation." In summing up his side Long said:

"What we are after today is nothing more than what the law provides. We are allowed, according to Section 7, to choose our own representation. We chose this organization, the Amalgamated, for our representation. We have been denied the right to have them represent us in grievances. All we are asking is the right to have these men from the Amalgamated represent us in our grievances. We are not going into wages or hours or grievances; all we want is the right to have them represent us. Union recognition is the main issue."

Weir on behalf of defendant stated:

"In June, 1933, our employees adopted a plan of organization for collective bargaining and elected representatives to deal with the company in all matters of collective bargaining. Committees were selected from the various mills, in all totalling about fifty men * * * One hundred eighty-one different matters have come up since the organization of these committees pertaining to wages, hours and working conditions, and they have all received prompt attention and have been either adjusted satisfactorily to both parties or are still pending. When Mr. Long made his request that we negotiate with the committee which he claimed to represent, he was advised that all collective bargaining for our employees would have to be conducted by the committees which our employees had chosen. * * * To summarize, our position is this: We can not submit to arbitration the settled policy of the Company to maintain an open shop and not to contract with the Amalgamated Association of Iron, Steel and Tin Workers."

The hearing lasted three hours. Defendant's plan of employee representation was already in the hands of the Labor Board. The only part of the plan criticized or objected to was the provision limiting the election of representatives to employees of the defendant. Weir agreed to recommend an amendment in this respect.

Considerable discussion before the board related to when and how the next election of representatives of employees should be held. Chairman Wagner summarized the discussion and adjusted the situation in these terms:

"Can we do this? * * * Suppose we have the election as it is scheduled under your by-laws [company plan], whatever it may be. Can we agree that the election will be held in this respect, that the men will have the right to choose, either within or without the organization? * * * Secondly, will you permit representation from the National Labor Board to supervise the elections?"

This was assented to by both parties. Scrapping the company plan was not suggested by the board but the holding of an election under the supervision of the board at the time named in the plan was the result of the three hours' discussion. It was considered that if the employees exercised their right to elect under the supervision of the board, representatives of their own choosing from without as well as within the mills their right to collective bargaining was fully recognized. This appears from the following memorandum signed after the meeting:

"It is agreed:

"1. That the strike now pending in the Weirton Steel Company be called off immediately.

"2. The striking employees are to be permitted to return to work without discrimination, prejudice, or physical examination.

"3. An election will be held during the second week of December under the supervision of the National Labor Board, the procedure and method of election to be prescribed by the Board.

"4. The employees shall be permitted, as guaranteed by the provisions of section 7(a) of the National Recovery Act, to select representatives of their own choosing, and the employers agree to bargain collectively with the representatives so elected.

"5. In the event that any dispute arises out of this agreement, it is agreed that the same shall be submitted to the National Labor Board for decision.

"[Signed] E. T. Weir
"Representing Weirton Steel Company
"[Signed] Wm. J. Long
"Representing Striking employees
"[Signed] Robert F. Wagner
"Chairman of National Labor Board."

Weir promptly made his recommendation to the rules committee of the Company Union and the plan was unanimously amended by the adoption of the following additional articles:

"XII. All provisions herein requiring

Employees' Representatives to be in the employ of the Company are suspended during such period as the National Industrial Recovery Act, approved June 16, 1933, is in force.

"XIII. The election of Employee Representatives provided for herein to be held in December, 1933, shall be held under the supervision of the National Labor Board."

No further communication from the Labor Board was received by the defendant until the afternoon of Saturday, December 9, 1933, with the nomination election scheduled to begin at midnight the next day.

November 28, Dewey, a representative of the National Labor Board, called on the president of defendant and told him he had come to discuss rules for the election. Williams referred him to the chairman of the rules committee of the Company Union. Dewey had a series of conferences with representatives of the Amalgamated Association and of the Company Union to explain the manner in which elections were generally conducted by the National Labor Board and to receive suggestions as to the manner in which the December election should be held. Dewey's conferences revealed that ideas of the two unions were so conflicting that agreement could not be hoped for. He returned to Washington December 4. December 5, only six days before the primary election, the rules committee of the Company Union recognizing the recent amendments posted rules for the election throughout the mills and on the same day mailed a copy to Dewey at Washington.

December 7, a second meeting was called by the Labor Board and was attended by representatives of the Amalgamated Union and of the Company Union. Defendant was not invited. Nomination by petition was urged by the Amalgamated Union and resisted by the Company Union. No agreement was reached. The next day a set of rules was formulated in Washington and mailed to representatives of the two unions and to the defendant.

These rules were received by the defendant from the National Labor Board on Saturday afternoon, December 9, 1933, with the request that they be posted in the mills. The primary election was scheduled to begin at midnight the next day. The rules were a substantial departure from the plan of the Company Union. They provided for nomination by petition as well as by secret ballot. The number of representatives to be elected was increased from 49 to 98. The Company

Union representatives refused to adopt these last minute changes and so advised the defendant. Defendant did not post these rules in the mills and so advised the National Labor Board December 11, 1933. No representatives of the National Labor Board were present on December 11 at the plants of defendant to supervise the primary election. In the afternoon of that day representatives of the National Labor Board appeared at the offices of the company in Pittsburgh with a revised set of rules after approximately two-thirds of the employees had voted.

The primary election of December 11 and the election of December 15 were held under the provisions of the plan of the Company Union. According to the joint affidavit of all members of the rules committee of the Company Union, whose duty it was to conduct the election and receive and tabulate the returns, 9,336 employees voted out of 11,443 eligible to vote. Spoiled ballots were not counted. The 49 representatives elected were the choice of approximately 82 per cent. of the employees of the defendant.

Representatives of the Amalgamated Union claimed the election was the result of intimidation and coercion on the part of the defendant. It is true the company took an active part in advising its employees to vote for the nominees of the Company Union. During the period from the settlement of the strike in October to the December elections there was active campaigning. The Amalgamated Union was advocating the election of certain persons and the Company Union was advocating others. The president of the company appeared at a number of meetings as did other officers and foremen of the company. Such meetings were held nearly every night for three weeks prior to the election. Williams exhibited copies of letters from customers expressing fear that deliveries would be interrupted by strikes and threatening to transfer their business to other manufacturers. One letter stated: "We found it necessary during the past two weeks to make a few cancellations of orders with you and it was necessary that we place this tonnage with other mills." Doubtless these letters were shown to the employees for the purpose of influencing them to vote against Amalgamated Union candidates because the strike had been brought about by Amalgamated employees. An issue was made of the strike. At almost every meeting Williams characterized it as unfair. He called attention to the amendment whereby any one was eligible to election as a representative whether he worked for the company or not.

He argued the advantages of the Company Union. He recited his experience with the Amalgamated Union and criticized its policies. He frequently stated that he would make no contract with the Amalgamated Union as "there was no such requirement in the steel code, the National Recovery Act, or the President's recovery program." At the same time he concluded his remarks with the statement that he "had given the Company's side of the case to them, but that the election would be by secret ballot, and the matter would be left entirely in their hands so they could come in and vote according to their own judgment." Many other officers of the defendant and its foremen addressed employees' meetings and urged the election of Company Union candidates. Other charges of unfairness are obscured by a cloud of contradictory affidavits.

The Amalgamated Union employees continue to oppose the right of the Company Union to represent the employees in collective bargaining. This existing hostility is shown by the petitions signed by several hundred employees to the National Labor Board in February, 1934, "protesting against the December election in the Weirton Steel plant and designating the Amalgamated Union and its officers as the 'choice of organization and representation for the purpose of collective bargaining,' " and requesting the board to conduct a new election. Defendant continues to maintain that it will deal only with representatives of the Company Union duly chosen by the employees as their representatives at the December election. Plaintiff filed affidavits signed by a large number of Clarksburg employees, and verified a few days before the hearing of this motion, stating "a recognition of the Amalgamated Union is essential to the proper adjustment of our differences with the Management. * * *"

The somewhat extended consideration of the facts clearly suggests the law controlling the court in determining this motion for a preliminary injunction. These facts picture a labor dispute. This dispute has existed since the Amalgamated Union lodges were organized at defendant's plants. The employees are split into hostile camps. They are divided between loyalty to the Amalgamated Union and loyalty to the Company Union.

A very recent act of Congress defines and limits the jurisdiction of this court in the issue of injunctions in labor disputes. The act is entitled "An Act to amend the Judicial Code and to define and limit the jurisdiction of courts sitting in equity, and for other purposes." Act March 23, 1932, 47 Stat. 70. The act (section 1 [29 USCA § 101]) provides that:

"No court of the United States, as herein defined, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter. * * * *"

The act (section 7 [29 USCA § 107]) prescribes the procedure and character of proof in determining when an injunction may issue:

"Sec. 7. No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as herein defined, except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of fact by the court. * * * *"

Cases involving labor disputes are specified in the act (section 13(a), 29 USCA § 113(a):

"Sec. 13. (a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interest therein; or who are employees of the same employer; * * * whether such dispute is * * * between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a 'labor dispute' (as hereinafter defined) of 'persons participating or interested' therein (as hereinafter defined)."

When a person shall be held to be a party to a labor dispute is set out in the act (section 13(b), 29 USCA § 113(b):

"Sec. 13. (b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation."

The term "labor dispute" is construed in the act (section 13(c), 29 USCA § 113(c):

"Sec. 13. (c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

In issuing injunctions this court must follow the procedure prescribed by section 7 above quoted. The usual procedure on motions for preliminary injunctions is a hearing upon ex parte affidavits. Congress was not satisfied with the fairness and sufficiency of this method of proof. To meet the difficulties experienced in this class of cases section 7 was enacted. It provides that the court shall have no jurisdiction to issue an injunction in any case involving and growing out of a labor dispute "except after hearing the testimony of witnesses in open court (with opportunity for cross-examination)."

The bill of complaint alleges that there are two unions of employees in the defendant's business and that there was and is a conflict between them with respect to the election of employee representatives. The proof in the case sustains this averment. The bill further alleges that the defendant supported the Company Union and encouraged employees to vote for representatives to be chosen at an election prescribed by the by-laws of that union. The proof in the case also sustains this averment.

It is contended that the act is not applicable to a suit wherein the United States is complainant. The act deals with labor disputes. It is immaterial who the complainant may be if a labor dispute is involved and the defendant is a party thereto. The bill further charges that the defendant was guilty of acts of coercion and intimidation against employees when they were exercising or seeking to exercise their right of electing representatives for the purpose of collective bargaining. Defendant, therefore, was a party to a labor dispute. By reason of such acts the bill prays relief against defendant.

As this is a case involving or growing out of a "labor dispute" and defendant is a "party" to that dispute against whom relief is sought, this court is without jurisdiction to issue a temporary injunction in such case unless the testimony of witnesses is heard in open court with opportunity for cross-examination.

A second ground of objection to granting preliminary relief will now be considered.

Early in July, 1933, two official organizers of the Amalgamated Union went to Weirton, Steubenville, and Clarksburg. Six lodges were organized at Weirton, one at Steubenville, and one at Clarksburg. There is a wide divergence between the parties as to the number of employees belonging to Amalgamated lodges. One organizer states in his affidavit that there was a total of 7,062 members in the six lodges at Weirton, of whom 3,564 had paid their initiation fees in full. The other organizer states that the Union at Clarksburg had a total membership of 956, of whom 783 had paid their initiation fees in full. On the other hand the affidavits of defendant state that the membership in the Amalgamated of employees at the three plants was at its peak during the strike of October, and that such membership was nearer 1,000 than 9,000.

Nine affidavits of plaintiff respecting the organization of the Company Union charge that defendant presented the employees representative plan to the workers as one already in effect; that the employees were not consulted in its preparation nor given an opportunity to vote on the question of accepting or rejecting it; that they never adopted it; that all the employees ever did or could do was to vote under a plan which they had not requested or formulated, but which had been promulgated by their employer and imposed upon them without regard to their wishes. Further, that since its adoption the plan has been nurtured by defendant as a sole means of collective bargaining whereas it is a device for defeating the right of collective bargaining secured by the statute. An employee in the strip steel department states that during the latter part of June notices were posted throughout the mill explaining the plan; that these notices were understood by very few; that one day before the June primary election a pamphlet entitled "Employees' Representative Plan" was posted throughout the mill, a copy of which he received from the roller; that he knew nothing about an election to be held until the day of the election when ballot boxes were moved into the mill. A sheet mill roller states that a superintendent came to him and said, "We are going to form an employees' plan," but told him nothing about the plan and did not show him a copy of it; that on the day of the primary election the superintendent told his men "to go and vote as the Company wanted them to vote." A group

of workers at the Clarksburg plant described the initiation of the plan there: During the latter part of June notices on defendant's letterheads were posted in the mill, signed by defendant, to the effect that the company in the near future would hold an election; that about a week later the defendant posted notices announcing the plan of conducting the election; that the company's officials appointed a committee to supervise the election. An assistant roller at Weirton states that he and 16 other men were called into the general office of the strip steel department and shown a copy of the plan by the superintendent, who urged all of them to "try to put through the plan as near as possible to 100%." Other affidavits are to the like effect.

In denial of the above affidavits defendant has filed eleven affidavits relating to the adoption of the plan.

Plaintiff charges that defendant consistently maintains that a vote at a Company Union election is a vote approving such union and that defendant sought by coercion, intimidation, and improper tactics to compel or induce employees to vote at the December election for representatives under the Company Union plan. That the coercion and intimidation consisted of threats of discharge for not voting, changes in the place of payment on election day, actual discharges at election time for not voting, physical coercion to compel voting, marking of ballots by others than those entitled to vote, threats to close down the plants if the Amalgamated Union should win, refusal to allow Amalgamated employees to attend meetings of employees, and the giving of a party to a large number of girl employees. Supporting these charges plaintiff files seventeen affidavits. Several employees state that they were told that if they did not vote for the Company Union, they would lose their jobs. A number of girls in the assorting room filed affidavits that on the eve of the election a party was given for them at a country club, when a number of defendant's officials were present. Beer, sandwiches, and cigarettes were served. The superintendent stated, "If you want your bread and butter every day vote the right way and that's the Company Union." The gathering gave the cheer:

"Ice Cream Soda, Ginger and Pop,
Company Union goes over the Top."

The party lasted until midnight and two of the girls "passed out."

Defendant filed forty-four affidavits contradicting the foregoing affidavits.

Another group of plaintiff's affidavits allege discrimination against Amalgamated Union employees subsequent to the strike. Forty-four affiants charge that certain employees were not put back to work after the strike; that others had been discharged for taking part in the strike; and that still others were given less desirable work after the strike.

Defendant filed sixty-six affidavits explaining in detail the reason for any discharge or change in working conditions.

Defendant filed affidavits of the 49 elected representatives of the Company Union that they were conducting collective bargaining for the employees with the company; that there is peace and quiet among the employees; and that neither the company nor its officers have ever attempted to dominate or control them. The affidavit of the secretary of the Company Union states that up to January 1, 1934, there had been 152 committee meetings of employee representatives at which 505 cases had been considered. Two hundred and ninety-six of these dealt with wages; 27 with safety; 182 with working conditions, including sanitation, medical service, housing, recreation, and public relations. Of the 505 cases, 298 were settled in favor of employees, 32 were compromised, 32 were withdrawn by the employees, and 96 were pending December 31, 1933.

Twenty of plaintiff's affidavits are dated in November, 1933; 52 in December; 44 in January, 1934; and 6 in February, 1934, all long before the filing of the bill of complaint in this suit. Eighty-seven affiants retract statements made in their original affidavits. Many of the affidavits in retraction are again retracted by the affiants and still others retract their retractions.

A preliminary injunction is extraordinary process. Granting such relief rests in the sound discretion of the court. Rice & Adams v. Lathrop, 278 U. S. 509, 514, 49 S. Ct. 220, 73 L. Ed. 480. Where the equities of a bill are denied fully and explicitly under oath, a court usually does not issue an injunction in limine but allows the matter to await a final hearing. Behre v. Anchor Ins. Co. (C. C. A. 2) 297 F. 986. The burden is upon the plaintiff to prove its contentions. A preliminary injunction should not be awarded on ex parte affidavits unless in a clear case. If there is any substantial doubt as to the right, it should be refused. Lare v. Harper & Bros. (C. C. A. 3) 86 F. 481. In order that a judge may pass upon the credibility of witnesses, it is necessary that they be

present in court for examination with opportunity of observing their manner and appearance upon the witness stand. Where the court has no such opportunity, affidavits of both sides are entitled to equal weight.

In this case the essential averments of the bill and plaintiff's affidavits in support of its motion are denied and contradicted by defendant's answer and affidavits. Two hundred and thirty-four affidavits were filed by plaintiff and 826 by defendant.

Obviously the case is controlled by the rule repeatedly announced in this district and circuit that a preliminary injunction is never granted where the pleadings and affidavits disclose that the plaintiff's contentions in fact and in law are seriously disputed. Lare v. Harper & Bros. (C. C. A. 3) 86 F. 481; United States v. Zukauckas (D. C.) 293 F. 756; General Talking Pictures Corporation v. Stanley Co. (D. C.) 42 F.(2d) 904; Popular Mechanics Co. v. Fawcett Publications (D. C.) 1 F. S. 292.

The case illustrates perfectly the propriety of the procedure prescribed by Congress and the futility of considering a motion for a preliminary injunction in cases of this kind upon ex parte affidavits. Not only is there a conflict of material facts but there are serious and intricate questions of law involved, particularly the question as to the constitutionality of the National Industrial Recovery Act (48 Stat. 195). Counsel in their briefs have given extensive and careful consideration to this constitutional question. Issues of the gravest importance are raised and should be determined only after final hearing.

The motion must be denied.