**GREEN et al. v. OBERGFELL et al.**
No. 7551.

United States Court of Appeals for the
District of Columbia.

Decided March 17, 1941.

48

See, also, D.C.D.C., 27 F.Supp. 934.

Jos. A. Padway, of Washington, D. C., for appellants.

Martin F. O'Donoghue and Wm. J. Hughes, both of Washington, D. C., for appellees.

Before STEPHENS, MILLER and RUTLEDGE, Associate Justices.

MILLER, Associate Justice.

Appellee, the International Union of United Brewery, Flour, Cereal and Soft Drink Workers of America, and its predecessors in interest, have for more than forty years contested with appellant, the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of

America, and its predecessors [1] in interest, the exclusive right to organize and claim as members the drivers of brewery wagons and trucks. For convenience, appellee will be referred to as the Brewery Workers Union and appellant as the Teamsters Union. For more than forty years both international unions have been affiliated members of appellant, the American Federation of Labor, and that federation has from time to time attempted to resolve the jurisdictional dispute, concerning membership, which has been carried on between its two affiliates.[2]

In 1933 the American Federation of Labor adopted an opinion and decision theretofore reached by its Executive Council which reads as follows: "In the case of the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America vs. The International Union of the United Brewery, Flour, Cereal and Soft Drink Workers of America, the Executive Council is of the opinion and decides that teamsters and chauffeurs in the brewery industry properly belong to and come under the jurisdiction of the International Brotherhood of Teamsters and Chauffeurs." The Brewery Workers Union refused to abide by this decision and when the Teamsters Union attempted to carry it out, conflict resulted between the two affiliates and their locals. This conflict finally precipitated the case in the lower court from which the present appeal has resulted.

The lower court decided [3] (1) that the Brewery Workers Union has the *"prior and exclusive right* to organize beer drivers as against the claim of defendant Teamsters Union, *or any other organization;"* [Italics supplied] (2) "That defendant Teamsters Union has never had jurisdiction over beer drivers * * * and became affiliated with the * * * American Federation of Labor, *subject to the prior and exclusive right* * * * of the said plaintiff Brewery Workers Union to organize beer drivers;" [Italics supplied] (3) that the American Federation of Labor is required to observe and protect the prior and exclusive right of the Brewery Workers Union to organize beer drivers. Pursuant to its determination of these issues, the lower court issued a permanent injunction against appellant, the American Federation of Labor, and nine of the individual appellants "as officers, members and representatives" of the American Federation of Labor, to the effect that they should be permanently enjoined and restrained from notifying any employers of beer drivers, central labor bodies, state federations of labor, or other interested parties, of its action "in transferring jurisdiction of beer drivers from plaintiff Brewery Workers Union to the defendant Teamsters Union;" and also adjudged that the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America, and five of the individual defendants, "as officers, members and representatives" of the Teamsters Union should be permanently enjoined and restrained (a) from in any manner carrying out, or attempting to carry out, the action of the American Federa-

---

[1] Records of the American Federation of Labor (1931) entitled "Fifty Years of Service" lists the affiliated unions and their histories:

International Union of the United Brewery, Flour, Cereal and Soft Drink Workers of America

Brewers National Union—Chartered—March 4, 1887

Changed name to National Union of United Brewery Workers of America—1891

Changed title to National Union of United Brewery Workmen—issued—September 22, 1902

Charter revoked—June 1, 1907. Reinstated—February 25, 1908

Changed title to International Union of United Brewery and Soft Drink Workers of America—December 29, 1917

Gained jurisdiction of International Union of Flour and Cereal Mill Workers in 1918

Changed to present title—November 29, 1918

International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America

Team Drivers Union, International—Chartered—January 27, 1899

Amalgamated with Teamsters National Union of America (an independent organization) taking new charter—August 22, 1903—title: "International Brotherhood of Teamsters"

Change of title to present one and new charter—December 22, 1910.

[2] See Jaffe, Inter-Union Disputes in Search of a Forum, 49 Yale L.J. 424, 438 et seq., giving a historical discussion of this jurisdictional conflict.

[3] Obergfell v. Green, D.C., 29 F.Supp. 589.

tion of Labor, transferring jurisdiction of beer drivers from plaintiff Brewery Workers Union to defendant Teamsters Union; (b) from persuading, by any means, lawful or unlawful, or coercing, intimidating, or threatening, employers of beer drivers who are members of the Bewery Workers Union in any effort to cause employers either to breach any collective bargaining agreement with the Brewery Workers Union, or any local member thereof, or to prevent or discourage the entering into of any new collective bargaining agreements with the Brewery Workers Union or any local member of it, on the ground of the decision of the American Federation of Labor of 1933, or to cause the discharge "of any member of the said plaintiff Brewery Workers Union from employment in a brewery because he failed to join the Teamsters Union under the illegal order of the American Federation of Labor of 1933;" (c) from fostering, encouraging, or conniving at any acts of coercion on the part of any local union affiliated with Teamsters and/or (d) from fostering and encouraging any organizational activities on behalf of the said International Teamsters Union to its local unions, attempting to carry out the decision of the 1933 Convention of the American Federation of Labor above set forth, by notifying any brewery employers of the

said decision of the American Federation of Labor, by its Convention of 1933.

▆ It would be difficult to imagine a case which more clearly involves a labor dispute within the meaning of the Norris-LaGuardia Act.[4] That Act contains, among other relevant provisions, the following:[5] "The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or *concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment,* regardless of whether or not the disputants stand in the proximate relation of employer and employee." [Italics supplied]

▆ Appellees contend that the quoted language (Section 13(c)) requires—in order that the case can be said to involve a labor dispute—that the disputants must stand in the relation of employer and employee. But the language is not susceptible of that construction.[6] Other sections of the Act, particularly Section 13(a),[7] make this conclusion even more certain.[8] As was said by Mr. Justice Stephens, speaking for this court, of the dispute involved in the case of Fur Workers Union, etc. v. Fur Workers Union, etc.:[9] " * * * it involves a dispute between 'one [associa-

[4] Act of March 23, 1932, 47 Stat. 70, 29 U.S.C.A. §§ 101 et seq. See 1 Teller, Labor Disputes and Collective Bargaining (1940) §§ 199 et seq.

[5] 47 Stat. 73, 29 U.S.C.A. § 113(c).

[6] New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012; Blankenship v. Kurfman, 7 Cir., 96 F.2d 450, 453.

[7] 47 Stat. 73, 29 U.S.C.A. § 113(a): "A case shall be held to involve or to grow out of a labor dispute when the *case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein;* or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; *whether such dispute is* (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) *between one or more employees or associations of employees and one or more employees or associations of employees;* or when the case involves any conflicting or competing

interests in a 'labor dispute' (as hereinafter defined) of 'persons participating or interested' therein (as hereinafter defined)." [Italics supplied]

[8] If there were any doubt upon the subject it would be removed by reference to the Committee Report when the Act was under consideration by Congress, H. R. Rep. No. 669, 72d Cong., 1st Sess. (1932) 10-11: "Section 13 contains definitions which speak for themselves. It is hardly necessary to discuss them other than to say that these definitions include, as hereinabove stated, a definition of a person participating in a labor dispute which is broad enough to include others than the immediate disputants and thereby corrects the law as announced in the case of Duplex Printing Press Co. v. Deering [254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196], supra, wherein the Supreme Court reversed the Circuit Court of Appeals, and held that the inhibition of Section 20 of the Clayton Act [29 U.S.C.A. § 52] only related to those occupying the position of employer or employee and no others."

[9] 70 App.D.C. 122, 127, 105 F.2d 1, 6, affirmed, 308 U.S. 522, 60 S.Ct. 292, 84 L.Ed. 443.

tion] * * * of employees' and another such association—to wit, the appellant and appellee unions. * * * The case involves or grows out of a labor dispute within the meaning of the term 'labor dispute' in subsection (c) of Section 13 because it is a 'controversy concerning * * * the association or representation of persons in negotiating * * * terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.' That is to say, the controversy concerns the representation of persons—to wit, fur workers—in negotiating terms or conditions of employment, although some of the members of the appellant union (those other than Schwartz and Haley) disputing with Zirkin's do not stand in the proximate relation of employees to Zirkin's as employer, and although, to the extent that the dispute is between the appellant and appellee unions, the disputants do not stand in the proximate relation of employer and employee to each other." The fact was, of course—in the Fur Workers case as in the present case—that the unions did not stand in any sort of employer-employee relationship, proximate or otherwise.[10]

▇ Nor is it material that no employer was joined as a party. The fact that, in cases previously arising under the Act, employers have appeared as parties, does not exhaust its possibilities or limit the broad scope and meaning which Congress intended to give to the Act.[11] It was in-

---

[10] Stephens, J., in the Fur Workers case, said further [70 App.D.C. at page 129, 105 F.2d at page 8]: "In the brief of the appellee union, the instant case is compared to United Electric Coal Companies v. Rice, 7 Cir., 1935, 80 F.2d 1, and it is sought to distinguish both the instant case and that case from Lauf v. E. G. Shinner & Co. [303 U.S. 323, 58 S. Ct. 578, 82 L.Ed. 872] upon the ground that in the latter the employer was an interested party to the controversy, whereas in the instant case the employer Zirkin's was not, upon the findings of fact, such a party, and whereas in United Electric Coal Companies v. Rice the employer was not such a party. * * * In United Electric Coal Companies v. Rice, two unions were disputing as to collective bargaining rights, and one was picketing an employer indifferent to the employees' choice. He sought an injunction in the United States District Court; the injunction was refused upon the ground that a labor dispute was involved (E.D.Ill., 1935, 9 F.Supp. 635). This ruling was reversed in the Court of Appeals upon the ground that since the employer was indifferent, the dispute was not between any of the employees and the employer, and that this was necessary to constitute a labor dispute under the Norris-LaGuardia Act (7 Cir., 1935, 80 F.2d 1). Certiorari to the Supreme Court was denied (1936, 297 U.S. 714, 56 S.Ct. 590, 80 L.Ed. 1000), and the appellees urge that this case is therefore persuasive, notwithstanding Lauf v. E. G. Shinner & Co. But the Supreme Court has made clear that the denial of certiorari imports no expression of opinion upon the merits of a case. Hamilton-Brown Shoe Co. v. Wolf Brothers, 1916, 240 U.S. 251, 258, 36 S.Ct. 269, 60 L.Ed. 629. Atlantic Coast Line R. Co. v. Powe, 1931, 283 U.S. 401, 403, 51 S.Ct. 498, 75 L.Ed. 1142. Moreover, the Court of Appeals later recognized that its ruling in United Electric Coal Companies v. Rice was overruled by the Supreme Court in Lauf v. E. G. Shinner & Co. and New Negro Alliance v. Gorcery Co. See Blankenship v. Kurfman, 7 Cir., 1938, 96 F.2d 450, 453."

[11] New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 559-561, 58 S.Ct. 703, 82 L.Ed. 1012; International Brotherhood of Teamsters, etc. v. International Union of United Brewery, etc., 9 Cir., 106 F.2d 871, 876: "The district court held that the demand on the Breweries of the Teamsters' Union for recognition as the bargaining agent of the brewery deliverymen and the boycott and acts of persuasion and coercion to compel such recognition do not involve a labor dispute within the provisions of the Norris-La Guardia Act, 47 Stats. 70, 29 U.S.C.A. § 101 et seq., and hence that it had the usual power to grant injunctive relief to prevent interference with interstate commerce. The court relied on United Electric Coal Companies v. Rice, 7 Cir., 80 F.2d 1. Its decision was rendered without the guidance of Supreme Court holdings to the contrary: Lauf v. Shinner & Co., 303 U.S. 323, 329, 58 S. Ct. 578, 82 L.Ed. 872, decided but 8 days before, and New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 559, 58 S.Ct. 703, 82 L.Ed. 1012, decided a few days after."; Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc., 311 U.S. 91, 99, 100, 61 S.Ct. 122, 126, 85 L.Ed. 63: "Nor does the controversy cease to be a labor dispute, as the Circuit Court of Appeals thought, because the plaintiff dairies' employees became organized. This merely transformed the defendants' activities from an effort to or-

tended drastically to curtail the equity jurisdiction of federal courts in the field of labor disputes.[12] That employer-employee relationships were involved, however, is obvious from the pleadings, the evidence, the judgment, and the injunction issued.[13] The essence of the dispute was the right of the Brewery Workers Union, on the one hand, and of the Teamsters on the other, to organize particular workers for collective bargaining purposes, i. e., "the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange [sic] terms or conditions of employment." The injunction issued by the lower court is primarily concerned with the employer-employee relation. It enjoins the American Federation of Labor from "notifying any employers of beer drivers * * *;" and enjoins the Teamsters Union "from persuading by any means lawful or unlawful, * * * employers of beer drivers * * *;" and "from fostering and encouraging any organizational activities * * * to its local unions * * * by notifying any brewery employers * * *." That persons "engaged in the same industry, trade, craft or occupation" were involved is equally obvious. The language which runs like a red thread throughout the tremendous record in this case is "beer drivers;" persons who were engaged in the brewery *industry;* persons engaged in the *trade* or *craft* or *occupation* of driving beer wagons, beer trucks, and soft drink trucks. It will be noted, also, that the "case" which Section 13(a) of the Act defines as coming within its terms is one which involves *or* grows out of a labor dispute; which *involves* persons who are *engaged* in the same industry, *or have direct* or *indirect* interests therein.

As the suit involves a labor dispute, Section 1 of the Norris-LaGuardia Act [14] becomes applicable and prohibits the issuance of a restraining order or injunction to restrain lawful acts,[15] and in any event—assuming the commission of unlawful acts—except in strict conformity with its provi-

---

ganize non-union men to a conflict which included a controversy between two unions. A controversy 'concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment' is expressly included within the definition of a labor dispute in the Norris-LaGuardia Act."

See Senn v. Tile Layers Protective Union, 301 U.S. 468, 57 S.Ct. 857, 81 L.Ed. 1229; Lauf v. E. G. Shinner & Co., 303 U.S. 323, 58 S.Ct. 578, 82 L. Ed. 872; United States v. Hutcheson, 61 S.Ct. 463, 85 L.Ed. ——.

[12] Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc., 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63. See United States v. Hutcheson, supra note 11.

[13] Cf. American Federation of Labor v. Swing, 61 S.Ct. 568, 570, 85 L.Ed. ——: "A state cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him. The interdependence of economic interest of all engaged in the same industry has become a commonplace. * * * The right of free communication cannot therefore be mutilated by denying it to workers, in a dispute with an employer, even though they are not in his employ."

Cf. also, United States v. Hutcheson,

61 S.Ct. 463, 466, 85 L.Ed. ——: "There is nothing remotely within the terms of § 20 [Clayton Act] that differentiates between trade union conduct directed against an employer because of a controversy arising in the relation between employer and employee, as such, and conduct similarly directed but ultimately due to an internecine struggle between two unions seeking the favor of the same employer. Such strife between competing unions has been an obdurate conflict in the evolution of so-called craft unionism and has undoubtedly been one of the potent forces in the modern development of industrial unions. These conflicts have intensified industrial tension but there is not the slightest warrant for saying that Congress has made § 20 inapplicable to trade union conduct resulting from them."

[14] 47 Stat. 70, 29 U.S.C.A. § 101: "No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a *strict conformity* with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter." [Italics supplied]

[15] International Brotherhood of Teamsters, etc. v. International Union of United Brewery, etc., 9 Cir., 106 F.2d 871, 877.

sions.[16] In at least three respects the lower court failed to conform to the requirements of Section 7 of the Act.[17] That section provides, in part, as follows:

"No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as herein defined, except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of fact by the court, to the effect—

* * *

"(e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

"Such hearing shall be held after due and personal notice thereof has been given, in such manner as the court shall direct, to all known persons against whom relief is sought, and also to the chief of those public officials of the county and city within which the unlawful acts have been threatened or committed charged with the duty to protect complainant's property: * *."

■ The injunction in the present case was granted on October 6, 1939, and a denial of stay thereof was filed on the same day. Findings purporting to conform to the requirements of the Act were not made until seven days thereafter, on October 13, 1939. This is the first failure of compliance with the requirements of the Act above set out.[18]

■ Second, the findings made and the supporting evidence in the record are insufficient to satisfy the requirements of the statute. Thus, Finding No. 66 is inadequate on its face. It states that notice of hearing was given to "all persons against whom relief has been sought," but it does not state—as the law requires—that such notice was ever given "to the chief of those public officials of the *county and city* within which the unlawful acts have been threatened or committed." [Italics supplied] Moreover, it states that the hearing required by the law was had "after hearing the testimony of the chief of the public officials * * *." Just what this means it is difficult to say. Certainly it does not show the strict compliance with its terms which the law requires,[19] and there is no other finding upon this point. In this respect the record shows no more than that John J. Keegan, Chief of Detectives of the City of Portland, testified as a witness for appellees. The record is bare of (1) any showing of service or attempted service of notice upon any of the officials of Multnomah County, Oregon, in which the City of Portland is located; (2) any showing of the offices or names of officers of either Multnomah County or the City of Portland who are "the chief of those public officials of the county and city within which the unlawful acts have been threatened or committed charged with the duty to protect complainant's property." Specifically, the record fails to show even (3) whether John J. Keegan was the chief of those public officials of the City of Portland who were charged with that duty. Again, while the record shows violence and destruction of property in Portland, Oregon, and while the court found: "* * * that the local police authorities, as established by the testimony herein of the *Chief of Police, were unable* to adequately give protection to the members of the Brewery Workers' Union by reason of the various acts of assault and violence and bombing of both trucks and taverns and breaking of windows and puncturing of tires on beer trucks driven by members of the Brewery Workers' Union * * *." [italics supplied] the testimony upon which this finding purports to be based fails to show either unwillingness or inability upon the part of peace officers to fur-

[16] Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc., 311 U.S. 91, 100, 61 S.Ct. 122, 85 L.Ed. 63.

[17] 47 Stat. 71, 29 U.S.C.A. § 107.

[18] 47 Stat. 72, 29 U.S.C.A. § 109: "No restraining order or temporary or permanent injunction shall be granted in a case involving or growing out of a labor dispute, except on the basis of findings of fact made and filed by the court in the record of the case *prior to* the issuance of such restraining order or injunction; * *." [Italics supplied] Cf. Grace Co. v. Williams, 8 Cir., 96 F.2d 478, 480.

[19] See United States v. Weirton Steel Co., D.C.Del., 7 F.Supp. 255, 263; Grace Co. v. Williams, 8 Cir., 96 F.2d 478, 480: "* * * it affirmatively appears that the order in the instant case was issued without hearing any testimony and without making any findings. The temporary restraining order was therefore improvidently granted, and the court was right in dissolving it."

nish adequate protection,[20] or that the unlawful acts were not actually abated and the offenders punished[21] long before the trial of the present case, to say nothing of its initiation in the District Court. In fact, the record shows that the witness testified concerning events which occurred during 1935; the original complaint in the present case was filed July 15, 1937; and the testimony was given at the trial which commenced on June 7, 1939. Obviously such a record cannot support a finding—as required by the statute in order to support the issuance of an injunction—that the responsible public officers *are unable or un-willing* to furnish adequate protection. Under the circumstances the lower court was without jurisdiction to issue the injunction complained of on this appeal.[22]

Moreover, this defect of jurisdiction could not be remedied, as appellee contends, by waiver upon the part of appellants. Although lack of jurisdiction of the person may be supplied in that manner, as for example by a pleading requesting relief similar to that requested by the other party,[23] waiver or consent cannot confer upon a court jurisdiction over the subject matter of the suit.[24] While every court of

---

[20] Section 7(e) of the Norris-LaGuardia Act requires a showing that public officers are unable or unwilling to furnish adequate protection. If this requirement is not met, no injunction should issue. See Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc., 311 U.S. 91, 100, 61 S.Ct. 122, 85 L.Ed. 63; International Brotherhood of Teamsters, etc. v. International Union of United Brewery, etc., 9 Cir., 106 F.2d 871, 877: "* * * the Norris-LaGuardia Act permits injunctive relief only if it be shown, inter alia, that 'the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.'"
See Wilson & Co. v. Birl, 3 Cir., 105 F.2d 948, 959; Grace Co. v. Williams, 8 Cir., 96 F.2d 478, 480, 481; 1 Teller, Labor Disputes and Collective Bargaining (1940) § 220.

[21] Cf. American Federation of Labor v. Bain, Or., 106 P.2d 544, 555, 130 A.L.R. 1278: "It is insisted, though not by the defendants, that this statute should be sustained as a valid exercise of the reserved power of the state to legislate for the public peace and welfare because it is a necessary and appropriate means of preventing disorders such as have characterized many labor controversies here in recent years. It is even asserted that the statute, since its enactment, has accomplished that purpose and had that effect. The opprobrious acts referred to are these: That men engaged in mass picketing accompanied by violence and breaches of the peace; that farmers were openly prevented from transporting upon the highways of this state their own products to the market; that streets in Portland were closed to traffic by mass picketing; that property owners were prevented from obtaining access to their own property; that thugs were employed to dynamite and destroy buildings, to commit assaults and other acts of violence.

"Most, if not all, of the acts in this catalogue of misdeeds were, at the time of the enactment of the statute, and still are, condemned by the criminal laws of this state. It needed no law prohibiting picketing to punish and prevent violence, breaches of the peace, assault and battery, arson, malicious destruction of property, trespass, and the closing of public streets by private individuals. If we are to go into the matter whether the statute has had the effect claimed for it—a dangerous field of inquiry where constitutional questions are at issue—it is recent history, known to all, and of which this court, takes judicial knowledge, its own records being a part of that history, that an aroused public opinion and vigorous enforcement of the criminal law, resulting in the prosecution and punishment of scores of labor malefactors, had at least something to do with the cessation of these evils."

[22] Lauf v. E. G. Shinner & Co., 303 U.S. 323, 329, 58 S.Ct. 578, 82 L.Ed. 872.

[23] Merchants' Heat & Light Co. v. J. B. Clow & Sons, 204 U.S. 286, 289, 27 S.Ct. 285, 51 L.Ed. 488. Cf. Rule 12(b), Federal Rules Civil Procedure, 28 U.S. C.A. following section 723c.

[24] United States v. Griffin, 303 U.S. 226, 229, 58 S.Ct. 601, 603, 82 L.Ed. 764: "Since lack of jurisdiction of a federal court touching the subject matter of the litigation cannot be waived by the parties, we must upon this appeal examine the contention; and, if we conclude that the District Court lacked jurisdiction of the cause, direct that the bill be dismissed." Woodmen of the World Life Ins. Ass'n v. Federal Communications Comm., 69 App.D.C. 87, 88, 99 F.2d 122, 123; Mansfield, Coldwater & Lake Michigan R. Co. v. Swan, 111 U.S. 379, 382, 4 S.Ct. 510, 28 L.Ed. 462; Minnesota v. Northern Securities Co., 194 U.S. 48, 62, 24 S.Ct. 598, 48 L.Ed. 870; Chicago, Burlington & Quincy R. Co. v. Willard, 220 U.S. 413, 420, 421, 31 S.Ct. 460, 55

general jurisdiction has power to determine whether the conditions essential to its exercise exist[25]—as the authorities relied upon by appellee demonstrate—exercise of this power cannot create additional jurisdiction.[26] In the instant case, as there was a labor dispute, within the meaning of the Norris-LaGuardia Act, the requirements of the Act concerning jurisdiction must be satisfied; absent which, the court had no jurisdiction to grant relief.

The conclusion is inescapable, therefore, that the lower court acted improvidently in granting an injunction and that its judgment must be reversed because of lack of jurisdiction, without more. However, as the case was fully tried on other issues which must necessarily arise again, in the event of a new trial; and as it was fully briefed and argued in this court, on

a record of two thousand seven hundred and sixty-seven pages, no useful purpose would be served by limiting our opinion to the jurisdictional question.

Each of the three major labor organizations which are parties to this controversy are voluntary, unincorporated associations; the American Federation of Labor is the parent and the other two are affiliated units of that Federation. It is a well recognized principle in the law of such voluntary associations that there shall be no judicial interference with intra-association affairs or determinations in the absence of special circumstances showing injustice or illegal action.[27] Among other reasons which are said to warrant judicial interference are violation of contract obligations,[28] and invasion of property rights.[29] Assum-

---

L.Ed. 521; Oneida Navigation Corp. v. W. & S. Job & Co., 252 U.S. 521, 522, 40 S.Ct. 357, 64 L.Ed. 697; Goldstone v. Payne, 2 Cir., 94 F.2d 855, 857, certiorari denied, 304 U.S. 585, 58 S.Ct. 1057, 82 L.Ed. 1547; Republic Supply Co. v. Richfield Oil Co., 9 Cir., 74 F.2d 907, 908, certiorari denied, Cities Service Co. v. Armsby, 296 U.S. 583, 56 S.Ct. 94, 80 L.Ed. 412; American Brake Shoe & Foundry Co. v. New York Rys. Co., 2 Cir., 282 F. 523, 527, appeal dismissed, 262 U.S. 736, 43 S.Ct. 704, 67 L.Ed. 1207; Cleveland Cliffs Iron Co. v. Kinney, 8 Cir., 266 F. 888.

[25] Texas & Pacific R. Co. v. Gulf, Colorado & Santa Fe R. Co., 270 U.S. 266, 274, 46 S.Ct. 263, 70 L.Ed. 578.

[26] Stoll v. Gottlieb, 305 U.S. 165, 171, 59 S.Ct. 134, 83 L.Ed. 104.

[27] Fish v. Huddell, 60 App.D.C. 263, 264, 51 F.2d 319, 320: "It is well settled that with such management and administration the courts will not ordinarily interfere." Gonzalez v. Archbishop, 280 U.S. 1, 16, 17, 50 S.Ct. 5, 7, 74 L.Ed. 131: "In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise. Under like circumstances, effect is given in the courts to the determinations of the judicatory bodies established by clubs and civil associations." Harris v. Missouri Pac. R. Co., D.C.E.D. Ill., 1 F.Supp. 946, 949; North Dakota v. North Central Ass'n, D.C.E.D.Ill. & N.D., 23 F.Supp. 694, 699, affirmed, 7 Cir., 99 F.2d 697. See Oakes, Organized Labor and Industrial Conflicts (1927) §

91; Chafee, The Internal Affairs of Associations Not for Profit, 43 Harv.L. Rev. 993, 1026: "The same policy has caused trade unions to be left freer in England than in this country. The English courts discovered that they had picked up a Hot Potato."; Comment, 45 Yale L.J. 1248, 1259 et seq.

[28] Robinson v. Dahm, 94 Misc. 729, 159 N.Y.S. 1053, 1057; Krause v. Sander, 66 Misc. 601, 122 N.Y.S. 54, 55, affirmed, 143 App.Div. 941, 127 N.Y.S. 1128.

But see Note, 49 Yale L.J. 329, 331: "Even when there has been a breach of contract, equity has traditionally refused to interfere with an association's internal affairs when it has discovered no threat to property or civil rights." Citing: State ex rel. Rhodes Mortician & Undertaking Co. v. New Orleans Funeral Directors' Ass'n, 161 La. 81, 108 So. 132; Franklin v. Pennsylvania-Reading Seashore Lines, 122 N.J.Eq. 205, 193 A. 712; Carey v. International Brotherhood of Paper Makers, 123 Misc. 680, 206 N.Y.S. 73.

[29] Lawson v. Hewell, 118 Cal. 613, 618, 619, 50 P. 763, 764, 49 L.R.A. 400; Clark v. Brown, Tex.Civ.App., 108 S.W. 421, 449, reversed on other grounds, 102 Tex. 323, 116 S.W. 360, 24 L.R.A.,N.S., 670; McCantz v. Brotherhood of Painters, Tex.Civ.App., 13 S.W.2d 902, 904; Crutcher v. Eastern Div., 151 Mo.App. 622, 630, 132 S.W. 307, 309; Ward v. McMath, 153 Ark. 506, 513, 241 S.W. 3, 6; Elfer v. Marine Eng. Ben. Ass'n, 179 La. 383, 389, 154 So. 32, 34; Robinson v. Dahm, 94 Misc. 729, 159 N.Y.S. 1053, 1056. For a general discussion, see Chafee, The Internal Affairs of Associations Not for Profit, 43 Harv.L.Rev. 993;

ing, for the purpose of this decision, the correctness of this interpretation of the law —upon which appellees rely, and upon which the decision of the lower court is grounded— the nature and extent of such obligations as may be owed by the American Federation of Labor to the Brewery Workers Union must be determined by reading, together,[30] the constitution of the Federation and the charter[31] granted by it to that Union.

Plaintiffs' Exhibit A, which is set out in the margin[32], although titled *Certificate of Affiliation* and issued in 1905, contains the vital language of the original charter, which it replaced. The original constitution of the American Federation of Labor was already in effect when this charter was issued to the Brewery Workers Union. It had been adopted several months prior to the issuance of the charter, and its effective date was March 1, 1887, three days prior to the issuance of that charter. Hence, whatever it may signify, the fact is —contrary to appellees' assertion on brief —that the Brewery Workers Union did not participate in the creation of the American Federation of Labor, and was not one of the unions which made the original grant or delegation of power to that Federation. From its own pleading it appears that the appellee union came as an applicant to the already existing American Federation of Labor. Consequently, the Brewery Workers Union acquired no rights or powers, and reserved no rights or powers—affecting its jurisdiction over membership, or limiting the power of the Federation over that subject—except to the extent that they are

---

Oakes, Organized Labor and Industrial Conflicts (1927) § 68.

[30] Green v. Brophy, 71 App.D.C. 299, 302, 110 F.2d 539, 542. The court indicated that to determine the question therein presented it was necessary to decide as to "the legal relationship between the union and the plaintiff arising out of their contract as embodied in the union's 'Certificate of Affiliation', or charter, and the plaintiff's constitution." See Jaffe, Inter-Union Disputes in Search of a Forum, 49 Yale L.J. 424, 447–449; Chafee, The Internal Affairs of Associations Not for Profit, 43 Harv.L.Rev. 993, 1027.

[31] The constitution which was in force on March 1, 1887, and for several months thereafter, provided for the granting of *charters*. An amendment adopted in December, 1887, substituted the title *Certificate of Affiliation*. Art. VIII, § 2.

[32] "Plaintiffs' Exhibit 'A'
"American Federation of Labor
"Doth Grant This
"Certificate of Affiliation
"To Julius Zorn, Gustav Richter, Louis Kemper, Aug. Priestersbach, Charles Kiendl, Fred Zepp, Hugo Leitholf, Charles Pommer, Emil Thomann, George Eyrich, H. Baumgaertner, John Kennedy, Wendelin Geiser, and to their successors legally qualified, to constitute the Union herein named and known under the title of
International Union of the United
Brewery Workmen,
for the purpose of a thorough organization of the trade, and a more perfect Federation of all Trades and Labor Unions. And the Union being duly formed, is empowered and authorized to initiate into its membership any person or persons in accordance with its own laws. And to conduct the business affairs of said Union in compliance with the best interests of the trade and labor in general. The autonomy of the Union is hereby ordained and secured.
"Provided, That the said Union do conform to the Constitution, Laws, Rules and Regulations of the American Federation of Labor, and in default thereof, or any part, this Certificate of Affiliation may be suspended or revoked according to the laws of this Federation. And should the said International Union of the United Brewery Workmen, be dissolved, suspended or forfeit this Certificate of Affiliation, then the persons to whom this Certificate of Affiliation is granted, or their successors, bind themselves to surrender the same with such other property as shall properly belong to this Federation. And further, in consideration of the due performance of the above, the
American Federation of Labor
does hereby bind itself to support the said International Union of the United Brewery Workmen, in the exercise of all its rights, privileges and autonomy as an affiliated Union.
"In Witness Whereof, We have subscribed our names and affixed the Seal of the American Federation of Labor, this twenty-second day of September A. D., One Thousand Nine Hundred and Five.
"New certificate. Original certificate issued March 4th, 1887.
"Samuel Gompers, President. James Duncan, 1st Vice-President. John Mitchell, 2nd Vice-President. Jas. O'Connell, 3rd Vice-President. Max Morris, 4th Vice-President. Chas. I. Kidd, 5th Vice-President. Denis A. Hayes, 6th Vice-President. John B. Lennon, Treasurer. Frank Morrison, Secretary. Executive Council."

set forth or recognized in the constitution and the charter.

By the charter, issued under the circumstances described, the American Federation of Labor empowered and authorized the Brewery Workers Union to initiate into its membership any person or persons in accordance with its own laws. It ordained and secured the autonomy of the Union. And it bound itself to support the Union in the exercise of all its rights, privileges and autonomy as an affiliated union. The constitution then in effect provided, among other things, that the Federation recognized the right of each trade to manage its own affairs and that one of its objects was the establishment of national and international trade unions, based upon a strict recognition of the autonomy of each trade and the promotion and advancement of such bodies.

The foregoing excerpts constitute the only language contained in the constitution and charter which provide affirmative support for appellees' contention. However, the absence from the constitution of any express provision giving, to the American Federation of Labor, control of membership jurisdiction, is said also to support the contention; which, as previously noted, was successfully urged in the court below. A careful analysis of the constitution and charter leads to the opposite result.

In the language of the two instruments, upon which appellees rely, the most persuasive word used is *autonomy*. This word has never been defined by an American court, so far as can be determined from the dictionaries and other work books. Webster defines it as meaning the power or right of self-government. Black's definition reads: "The political independence of a nation; the right (and condition) of self-government; the negation of a state of political influence from without or from foreign powers." Even if we were to make the far-fetched assumption of a full parallel between the Brewery Workers Union and an independent sovereign state, the result contended for still would not follow.[33] The assumption is improper in any event because the Brewery Workers expressly agreed to conform to the constitution, laws, rules and regulations of the parent organization, the American Federation of Labor.

In addition to the fragmentary excerpts from the constitution, upon which appellees' contention is based, that instrument provides: (1) "Art. I, Sec. 1: This association shall * * * consist of such Trades and Labor Unions as shall conform to its rules and regulations." (2) "Art. VIII, Sec. 1: In all questions not covered by this constitution, the Executive Council shall have power to make rules to govern the same, and shall report accordingly to the Federation." (3) "Art. VIII, Sec. 2: Charters for the Federation shall be granted by the President of the Federation, by and with the consent of the Executive

---

[33] According to the principles of international law, although full and absolute territorial jurisdiction is alike the attribute of every sovereign, nevertheless it is incapable of conferring full and absolute extra-territorial power. United States v. Wong Kim Ark, 169 U.S. 649, 684, 18 S.Ct. 456, 42 L.Ed. 890; The Exchange v. McFaddon, 7 Cranch 116, 137, 3 L.Ed. 287; Borchard, The Diplomatic Protection of Citizens Abroad, 7 Am.J.Int.L. 497, 515. Hence, each state can exercise certain powers over foreign subjects within its boundaries, with which their home states have no right to interfere. 1 Oppenheim, International Law (4th ed. 1928) § 290. Moreover, as every independent nation has the inherent right to determine for itself, and according to its own constitution and laws, what classes of persons shall be entitled to its citizenship (United States v. Wong Kim Ark, supra, 169 U.S. at page 668, 18 S.Ct. 456, 42 L.Ed. 890), it follows that under some circumstances a person may have a dual nationality (Perkins v. Elg, 307 U.S. 325, 329, 59 S.Ct. 884, 83 L.Ed. 1320, and authorities there cited), and be subject to the control of both nations. United States v. Wong Kim Ark, supra, 169 U.S. at page 691, 18 S.Ct. 456, 42 L.Ed. 840; Perkins v. Elg, supra; 1 Oppenheim, supra at §§ 308 et seq.; 1 Hyde, International Law (1922) §§ 372 et seq. Frequently the situation arises in which a person may elect to be a citizen of one or the other. 1 Hyde, supra at §§ 374, n. 3, 375, n. 2; Perkins v. Elg, supra. In any event, the law of the United States permits a renunciation of citizenship (1 Oppenheim, supra at § 302(4); Ex parte Griffin, D.C. N.D.N.Y., 237 F. 445, 449; Perkins v. Elg, supra, 307 U.S. at page 334, 59 S.Ct. 884, 83 L.Ed. 1320) and assumption of citizenship in another nation. Perkins v. Elg, supra. See also, 1 Hyde, supra at §§ 376 et seq. It has never been supposed that sovereignty was abandoned or the right of self-government relinquished because of such limitations upon the rights and powers of an independent nation to determine its membership.

Council, to all National and International and Local bodies affiliated with this Federation." Furthermore, as previously noted, the charter expressly conditioned its grants of power, and its authorization to the Brewery Workers Union, concerning the initiation of persons into membership, by the following reservation: "Provided, That the said Union do conform to the Constitution, Laws, Rules and Regulations of the American Federation of Labor * * *." And, finally, the obligation assumed by the Federation was expressly stated to be in *consideration of the due performance of the above*.[34]

Further language of the constitution and charter reveals a large and comprehensive plan for the protection and benefit of toiling millions of laborers; to unite them permanently; to secure recognition of their rights; to encourage the formation of more trades and labor unions; to secure their closer federation; to secure legislation in the interests of working people; to influence public opinion in their favor. In securing these objectives the constitution specified *not* recognition of the autonomy of *unions* but of each *trade*,[35] and it provided expressly: "Art. VI, Sec. 3. While we recognize the right of each trade to manage its own affairs, it shall be the duty of the Executive Council to secure the unification of all labor organizations * * *."

Examination of the language of the charter reveals, also, that the assumption, by the American Federation of Labor, of the obligation to support the rights, privileges and autonomy of the Brewery Workers Union, was in terms of that union *as an affiliated union*—not as an independent agency—and was with relation to the well-being of other unions and of labor general-

ly. Moreover, the charter specified that it was granted for the purpose of a thorough organization of the trade, and a more perfect federation, *of all trades and labor unions*. Further, it was specified that the Brewery Workers should conduct its business affairs in compliance with the best interests of the trade *and labor in general*.

These provisions of the constitution—and of the charter which the original affiliates prepared pursuant to the authorization of Article VIII, Section 2 thereof—leave no doubt as to the broad scope of power vested and intended to be vested in the American Federation of Labor.[36] They were accepted and agreed to by appellee union just as they have been accepted and agreed to by more than a hundred other affiliates. They are inconsistent with the contention made by appellees and with the conclusions reached by the lower court. That the members of the Federation, in framing the constitution, had no intention of crystallizing any then existing scheme of membership jurisdiction into permanent form, or of guaranteeing to protect any affiliated union in a "prior and exclusive right" against "any other organization," as found by the trial court, is thus clearly revealed. How wide of the mark is such an interpretation, is further revealed by the totally inconsistent language of Article VIII, Section 3 of the constitution: "* * * Any seven wage workers of good character, and favorable to Trades Unions, and not members of any body affiliated with this Federation, who will subscribe to this Constitution, shall have the power to form a local body, to be known as a 'Federal Labor Union', and they shall hold regular meetings for the purpose of strengthening and advancing the Trades Union movement, and shall have the power

---

[34] See Lawson v. Hewell, 118 Cal. 613, 619, 50 P. 763, 764, 49 L.R.A. 400: "In all matters of policy or of the internal economy of the organization, the rules by which the members have agreed to be governed constitute the charter of their rights, and courts will decline to take cognizance of any matter arising under these rules. Whether the rules have been violated, or whether a member has been guilty of conduct which authorizes an investigation by the association, or the imposition of the penalty prescribed by it, is eminently fit for the association itself to determine; and, if the investigation is in accordance with its rules, the party charged has no ground of complaint, since it is but carrying into effect

the agreement he made when he became a member of the association."

[35] Const. Art. II, § 2. The original charter says: "The autonomy of the Union is hereby ordained and secured." Since this charter was granted under the authority of the constitution, if there is any conflict between the two it must be resolved in favor of the constitutional provision.

[36] Berkeley v. Harper, 3 App.D.C. 308, 313: "The principle of construction, as applied to the clauses and conditions in the constitution and by-laws of these beneficial associations, is required to be liberal, in order to effectuate the main purposes of their organizations."

to make their own rules in conformity with this Constitution, and shall be granted a local charter by the President of this Federation, provided the request for a charter be endorsed by the nearest local or National Trades Union officials connected with this Federation."

It was inevitable, as industrial development and expansion took place, that new and perplexing problems of membership jurisdiction should arise.[37] The fallacy of appellees' contention in this respect is patent when we consider that drivers of trucks were not even thought of in 1887, because there were no trucks in existence until a number of years later. Herein lay one of the greatest dangers of fraternal strife. If a united front was to be maintained by organized labor in its efforts to secure just treatment for working people it was necessary to have a strong, efficient, central federation to secure understanding and unification of efforts. These were the considerations which persuaded them to agree, and state in the first section of the first article of their constitution, that affiliated unions of the Federation must "conform to its rules and regulations." And it was, no doubt, as a result of the counsel of wisdom, that they decided not to attempt to cover in the constitution all the difficult questions of the future, but instead, provided that, as to all of them, not covered in the constitution, the Executive Council should "have power to make rules to govern the same."[38] This, it will be noted, was in addition to the power of amendment which was reserved by Article IX, Section 1, of the constitution. It will be noted, also, that the obedience and compliance required of the appellee union by the constitution and charter was not limited to provisions or rules then existing. Instead, the requirement was broad, comprehensive and unqualified.

It is apparent from the language used in the charter that reluctant compliance, or unwillingness to comply with the constitution, rules and regulations, was anticipated, and provision was made, therefore, that in such case the affiliation might be terminated. What we have in the present case, however, is an insistent desire to retain the benefits of affiliation and federation without giving, in return, the compliance required by the constitution and charter and which, according to the express language of the latter, constitutes the consideration for those benefits.

Nor does the subsequent history of relations between the American Federation of Labor, the Teamsters Union, and the Brewery Workers Union provide any basis upon which to rest a contention that the Federation relinquished any of the powers revealed by the constitution and charter. Assuming that it is proper to look to that history for the purpose of interpretation,[39] the record shows that at the second annual convention of the American Federation of Labor the constitution was amended so as to change the name of the charter issued to affiliated unions to Certificate of Affiliation. But the language of the instrument remained the same in all other respects, and the mutual rights, powers and obligations also remained the same.

In 1899, the Teamsters Union became affiliated with the American Federation of Labor, under a Certificate of Affiliation, which contained the same language as the charter issued to the Brewery Workers Union in 1887. Apparently, a feud started between the Brewery Workers and the Teamsters at once. Each claimed jurisdiction over drivers in the brewery industry. In fact, not only did the Brewery Workers claim jurisdiction against the teamsters over beer drivers, but they

---

[37] Brooks, Unions of Their Own Choosing (1939) 140 et seq.

[38] Art. VIII, § 1.

[39] Old Colony Trust Co. v. Omaha, 230 U.S. 100, 118, 33 S.Ct. 967, 972, 57 L. Ed. 1410: "Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence." Pitcairn v. American Refrigerator Transit Co., 8 Cir., 101 F.2d 929, 937, certiorari denied, 308 U.S. 566, 60 S.Ct. 78, 84 L.Ed. 475: "Generally speaking, the cardinal rule of interpretation is to ascertain, if possible,

from the instrument itself the intention of the parties, and to give effect to that intention. Where there is obscurity or ambiguity, however, the language used should be read in the light of all the surrounding facts and circumstances, including the acts of the parties indicating what interpretation was placed upon it by the parties themselves. Contemporaneous exposition of the contract is entitled to great, if not controlling, influence in ascertaining the intention of the parties." Harten v. Loffler, 29 App.D.C. 490, 503, affirmed, 212 U.S. 397, 404, 29 S.Ct. 351, 53 L.Ed. 568.

claimed jurisdiction over engineers against the Engineers Union; over firemen, against the Firemen's Union; over coopers, painters and other crafts, against the respective unions whose membership covered these crafts. There was thus presented to the American Federation of Labor, probably, the most fundamental question with which it has had to deal and which eventually led to the major defection of several international unions and subsequent organization of the rival labor organization, the Committee for Industrial Organization.[40]

During the years prior to 1899, not only were jurisdictional disputes over membership frequent, but they were frequently brought to the Federation for settlement; in fact, at each succeeding convention of the Federation the great proportion of the grievances presented by the affiliated unions involved questions of jurisdiction.[41] The Federation found itself often confronted with the unhappy choice between limiting that trade autonomy which was specified by the constitution as a major objective, or, on the other hand, of disintegrating a composite organization of workers, which, while not trade-autonomous, had nevertheless demonstrated remarkable vitality. And, in spite of the decisions which the Federation made in these cases, the dissatisfied parties would sometimes return year after year with the same complaints—hoping that some succeeding committee or convention would render more favorable decisions—and, indeed, would receive consideration over and over again. This procedure became increasingly burdensome to the committees and to the delegates at their annual conventions.

At the Convention of 1900, the Federation's Committee on Grievances reported on the unhappy situation; expressed its opinion that in such cases "narrow conceptions of strict trade autonomy should give way to the policy which * * * will best serve the interests of the workers immediately involved, and best promote the power of the general movement." The Committee reported further as follows:

"As a further result of our experience, we would give it as our opinion that this convention should not attempt to settle disputes of jurisdiction against the will or protest of one of the parties at interest. Believing, as we do, and subscribing to the principle of voluntary arbitration, we are of the opinion that this convention should only assume the privileges and power of a court of arbitration in such questions by mutual consent of the organizations at interest. Such a policy would have a beneficial effect in avoiding to some degree the friction which develops in this convention as a result of these opposing claims, and would compel the disputants to make a more serious effort to follow a policy of conciliation and get together in conference, with a view to settling their differences. Were such a course pursued, we feel confident that disputes would be more readily and more satisfactorily adjusted, and the interests of the movement immeasurably advanced.

"It is also the settled conviction of your committee that were half the energy displayed in these inter-union disputes applied to the betterment of the condition of the disputants the effect would be more profitable and redound to the greater credit and prestige of the trade union movement."

As a result of this report, two amendments of the constitution were adopted by the 1900 Convention, for the purpose of relieving the burden upon the delegates and the committees of the Federation, as follows:

"Section 11, of Article III: No grievance shall be considered by the convention that does not appear in the program, and no grievance shall be considered by any convention that has been decided by a previous convention (except upon the recommendation of the Executive Council), nor shall any grievance be considered where the parties thereto have not previously held a conference and attempted to adjust the same themselves.

\* \* \* \* \*

"Section 11, of Article IX: No charter shall be granted by the A. F. of L. to any national or international union without a positive and clear definition of the trade jurisdiction claimed by the applicant, and the charter shall not be granted if the jurisdiction claimed is a trespass on the

40 Taylor, Labor Problems and Labor Law (1938) 80.

41 Report of Committee on Grievances, at the 1900 Convention of the American Federation of Labor, 146: "At each succeeding convention of the American Federation of Labor we find that of the grievances presented for adjudication the great proportion of them involve questions of jurisdiction, which arise between bodies very often, both being chartered by this body."

jurisdiction of existing affiliated unions, without the written consent of such union."

In this manner the Federation attempted first, to devise a conclusive method of adjusting old jurisdictional disputes; and second, to prevent such disputes from arising in the future. But it should be noted, also, that no amendment was adopted to limit the *power* of the Federation in respect of jurisdictional disputes.

To carry out the purpose of the two amendments, the 1900 Convention also adopted a resolution which instructed the President of the Federation to secure from all affiliated national and international unions written declarations defining their *claims* of trade jurisdiction. The resolution specified that these claims should become a permanent record of the Federation as a guide to the issuance of charters. In response to an inquiry from President Gompers, the Brewery Workers, in 1901, claimed the following jurisdiction: "Jurisdiction over all regularly employed brewery workers, such as brewers, maltsters, beer drivers and stablemen, beer bottlers, engineers and firemen, oilers and helpers, brewery ice house workers and brewery general laborers; coopers who also partly perform brewers work."

In response to a similar inquiry from President Gompers, the Teamsters, in 1901, claimed the following jurisdiction:

"Any Teamster engaged driving a truck, wagon, hack, or vehicle, who does not own or operate more than five teams, shall be eligible for membership. All members employing *Teamsters,* must employ members of this organization and pay the Union scale of wages, prevalent in the district over which the Local Union has jurisdiction.

"A recent decision of the A. F. of L. gives the United Brewery Workmen jurisdiction over men engaged driving *beer wagons.*" [Italics supplied]

But the controversy continued nevertheless.

The record reveals that throughout these early years, instead of asserting arbitrarily the power which had been delegated to it, the American Federation of Labor, under the diplomatic guidance of Samuel Gompers, attempted, so far as possible, to settle jurisdictional disputes by persuasion and arbitration; looking toward future adjustments as changes occurred in methods of production and employment. A significant report, presented by Mr. Gompers and embodying these ideas, was adopted by the Convention of the Federation in 1901.[42] The last sentence of that portion of the report which is set out in the margin, is of particular significance: "Nothing contained in this declaration is intended or shall be construed to mean a reversal of any decision rendered by former Executive Councils or previous Conventions on questions of jurisdiction." Here is clear evidence of recognition by the Federation of its power, even though, under particular

---

[42] "We realize that it is impossible to define the exact line of demarcation where one trade or form of labor ends and another begins, and that no hard and fast rule can be devised by which all our trade unions can be governed or can govern themselves.

"We emphasize the impossibility of the establishment of hard and fast lines; but if history and experience in the labor movement count for aught we urge upon our fellow-workmen that toleration and forbearance which are proverbial of our movement; for, without the recognition and application of these qualities any decision we may formulate will be futile. We, therefore, recommend as follows:

"1. As the magnificent growth of the American Federation of Labor is conceded by all students of economic thought to be the result of organization on trade lines, and believing it neither necessary nor expedient to make any radical departure from this fundamental principle, we declare that, as a general proposition, the interests of the workers will be best conserved by adhering as closely to that doctrine as the recent great changes in methods of production and employment make practicable. However, owing to the isolation of some few industries from thickly populated centers where the overwhelming number follow one branch thereof, and owing to the fact that in some industries comparatively few workers are engaged over whom separate organizations claim jurisdiction, we believe that jurisdiction in such industries by the paramount organization would yield the best results to the workers therein, at least until the development of organization of each branch has reached a stage wherein these may be placed, without material injury to all parties in interest, in affiliation with their national trade unions. *Nothing contained in this declaration is intended or shall be construed to mean a reversal of any decision rendered by former Executive Councils or previous Conventions on questions of jurisdiction.*" [Italics supplied]

circumstances, wisdom might seem to require use of the methods of persuasion and arbitration.

Thereafter, as the record reveals, a practice was followed of requiring agreement in advance, by both participants in each jurisdictional dispute, before the Federation would attempt a settlement and decision. Even in such cases decisions were sometimes reluctantly complied with or even rejected by interested parties.[43] This was particularly true of the Brewery Workers Union, which declined to abide by decisions of the Executive Council; refused to abide by arbitration decisions to which it had agreed in advance to be bound; refused to abide by an interpretation of an Executive Committee decision made by President Gompers, which it had agreed in advance should be binding upon it. This arbitrary course of action by the Brewery Workers Union, which resulted from its efforts to control membership jurisdiction of workers in several trades, against other unions whose membership was based upon trade autonomy, led to violence in several cities and to repeated demands by other unions that the Brewery Workers charter be revoked by the American Federation of Labor.

In 1903, the Executive Council reviewed these happenings and warned the Brewery Workers to comply with the decision rendered against it[44] in order to relieve the Council "of the disagreeable duty incumbent upon us in dealing with organizations that violate the decisions of the convention."

In 1904, the Convention of the Federation adopted a report of its Committee on Grievances providing as follows:

"* * * that all agreements and decisions heretofore made by, or at the instance of, the American Federation of Labor, between the Brewery Workmen, Engineers, Firemen and Teamsters, be and are hereby substituted by a working agreement upon the following basis:

"1. All brewery employes now members of the United Brewery Workmen's Union may remain such provided that such members of said United Brewery Workmen's Union as are now employed as Engineers, Firemen, or Teamsters, may withdraw from that organization, and join their respective unions, representing these crafts, without prejudice or discrimination on the part of their former associates.

"2. Hereafter the United Brewery Workmen's Union shall not admit to membership any engineer, fireman or teamster, but shall refer all applicants, members of these trades, to the respective organizations of these trades, now affiliated with the American Federation of Labor where such organizations exist.

"3. All engineers, firemen and teamsters employed in breweries shall conform to the laws, rules and regulations made by that organization of which the majority of the members of the respective crafts employed in each brewery are members.

43 "The Executive Council regrets to state that much of its time has been unavoidably taken up with the settlement or attempted settlement of jurisdiction disputes. Despite the fact that your body in convention assembled has repeatedly declared for peace between the unions, and has advocated the submission of all matters in dispute to the arbitrament of third parties, the jurisdiction disputes seem to grow in number and in intensity. We regret to state that while many of the unions so engaged in controversies over jurisdiction are willing to accept any reasonable arrangement arrived at, a number of unions refuse to abide by the decision of an impartial arbitrator and insist narrowly upon their own interpretation of the boundaries of their trade."

44 "The causes of the constant strife, strikes, and lockouts in various cities are due primarily to the unwise course pursued by the United Brewery Workers' International Union in rejecting and acting in violation of the advice and decision rendered as the result of the experience of the labor movement.

"We therefore urge upon the executive officers of the United Brewery Workers' International Union full compliance with the decision of the New Orleans convention of the American Federation of Labor, and with the agreement reached at Cincinnati, Ohio, January 16, 1903, by the representatives of the United Brewery Workers' International Union, the International Union of Steam Engineers, and the International Brotherhood of Stationary Firemen.

"We strongly impress upon the executive officers of the United Brewery Workers' International Union the absolute necessity of complying with the decision above referred to at the earliest possible date, and to so advise us, *so that we may be relieved of the disagreeable duty incumbent upon us in dealing with organizations that violate the decisions of the convention.*" [Italics supplied]

"4. Whenever a majority of men employed as engineers, firemen or teamsters in any brewery are members of the respective unions of these crafts, the organization or organizations representing such majority shall appoint a committee to act co-jointly with the United Brewery Workmen's Union in any negotiations which may arise with the employers, provided that the United Brewery Workmen shall have equal representation with all the other organizations in joint conference.

"5. *Failure to comply with the provisions of this agreement within a period of six months after the date of adjournment of this Convention shall work a revocation of the charter of the organization or organizations so failing.*" [Italics supplied]

The 1904 Convention also adopted the following resolutions:

"Resolved, That the United Brewery Workmen be compelled to withdraw those engineers and firemen who have taken the places of striking engineers and firemen in the cities of St. Louis, Mo., and Belleville, Ill.

\* \* \*

"Resolved, That the United Brewery Workers be requested to withdraw all injunction suits now pending and dissolve such injunctions as have been secured against the International Unions of Stationary Engineers and Firemen, affiliated with the American Federation of Labor."

In 1905 the Executive Committee reported: "We endeavored to carry out the mandate of the Convention, but found it exceedingly difficult, aye, impossible. In fact, the matter took on aggravated form, particularly in Philadelphia, where we authorized one of our members to make an investigation and endeavor to carry out the decision. Nor have the brewery workmen withdrawn their members in the cities of St. Louis and Belleville." The Committee also set out a report of its investigator and then stated: "It will be observed that this report sets forth that all three organizations were guilty of improper conduct, and it goes without saying, as Mr. Strasser sets forth, that it was inadvisable to revoke the charters of all three organizations [Brewery Workers, Engineers, and Firemen]; but for additional misconduct, Mr. Strasser recommended a penalty to be imposed upon the Brewery Workers. However, that penalty your Executive Council did not feel warranted in imposing, believing that it had no such power; that after all, *such right and power was vested in the Convention itself*. We therefore transmitted to the three organizations Mr. Strasser's report and recommendation, omitting the specific penalty he recommended." [Italics supplied] In accord with this action of the Executive Council, President Gompers wrote to each of the three offending organizations urging an adjustment of differences "in a spirit of fraternity, mutual good will and mutual concessions, for the benefit of the members they represent, and for the benefit of the labor movement at large."

However, no adjustment occurred and the Convention of 1905 adopted the decision, a copy of which is set out in the margin.[45] The last paragraph of this de-

---

45 "1. All brewery employes now members of the United Brewery Workmen's Union may remain such provided that such members of said United Brewery Workmen's Union as are now employed as Engineers, Firemen or Teamsters may withdraw from that organization and join their respective unions, representing these crafts, without prejudice or discrimination on the part of their former associates.

"2. Hereafter the United Brewery Workmen's Union shall not admit to membership any engineer, fireman or teamster, but shall refer all applicants, members of these trades, to the respective organizations of these trades, now affiliated with the American Federation of Labor, where such organizations exist.

"3. All engineers, firemen and teamsters employed in breweries shall conform to the laws, rules and regulations made by that organization of which the majority of the members of the respective crafts employed in each brewery are members.

"4. Whenever a majority of men employed as engineers, firemen or teamsters in any brewery are members of the respective unions of these crafts, the organization or organizations representing such majority shall appoint a committee to act co-jointly with the United Brewery Workmen's Union in any negotiations which may arise with the employers, provided that the United Brewery Workmen shall have equal representation with all the other organizations in joint conference.

"5. *It shall be the duty of the Executive Council of the Federation and all National, International, State, City Central and Local Unions affiliated with the American Federation of Labor to exert*

cision is significant in that the action there directed to be taken approximates closely the action of the Federation and of the Teamsters Union of which complaint was made in the present case. This decision is significant, also, because it reflects the attitude of President Gompers, who, while opposed to revocation of charters as a matter of policy, nevertheless approved decisions by the Federation in jurisdictional disputes and the application of discipline and pressure to make such decisions operative and effective. This is clearly evidenced by the argument which he made, during debate,[46] in support of the proposed decision.

As a result of action taken at the 1906 Convention, the Brewery Workers charter was revoked in June, 1907. At the following 1907 Convention, the Executive Coun-

cil, in explaining its action, recited facts concerning continuing trouble between the warring organizations; reported that an investigation had been made; that a hearing was held for several days; that: "It was clearly proven, and not denied, that the decision of the convention had been violated, and on the part of the representatives of the Brewery Workmen it was declared that that organization would not abide by the decision;" that the Brewery Workers were given until May 1, 1907 to abide by the decision of the Federation's Convention; that on May 29, 1907, the Brewery Workers refused to abide by the decision; whereupon its charter was revoked.

At the 1907 Convention, upon a resolution introduced by President Gompers,[47]

---

every influence and power at their command to make the above decision operative and effective." [Italics supplied]

[46] "I want to say to you delegates in this Convention, as one of your colleagues, as well as a member of the Executive Council, that I have, in the Executive Council meetings, and elsewhere, absolutely been unswerving in my vote against the revocation of the Brewery Workers' charter. I do not believe in the revocation of charters as a remedy for the grievances that come up in the labor movement. I am not seeking the favor of the Brewery Workers when I make that statement, because I want to couple it with the further statement that I believe the Brewery Workers are wrong; and this conclusion does not come because they believe or do not believe in any philosophy in the trade union movement I do, or because they and I are at variance upon that question. My judgment on trade union affairs is not formed on whether a man differs or agrees on any economic or philosophical proposition. The concrete position of the Brewery Workers is wrong. They have never been able to demonstrate either in the Conventions of the American Federation, or before the committees of the American Federation of Labor, or before any person specially appointed to investigate this question, they have never been able to demonstrate to any impartial body brought together, large or small, that they were right. Every body of men that has considered the question in controversy between the Brewery Workers and the Engineers and Firemen has absolutely decided that the Brewery Workers were in the wrong. You will readily observe, then, that when I say I believe and know

they are in the wrong, and yet I vote, and will, so long as I have the power of voting, against the revocation of their charter; but they ought to be made to feel the decision and judgment of the labor movement that they are in the wrong. It is not to the interests of the Brewery Workers to refuse to move one iota from the position they have assumed. On the contrary, they have encouraged the membership—I say that advisedly—to stand in antagonism and opposition to the expressed conviction and decisions and declarations of the American Federation of Labor." [Italics supplied]

[47] "Resolved, That the Charter of the International Union of Brewery Workers be, and the same is, hereby ordered to be restored.

"Resolved, That the restoration of the Brewery Workers' charter in no way alters or modifies the declarations and decisions of the American Federation of Labor in regard to the jurisdiction claims of the International Union of Steam Engineers; the Brotherhood of Stationary Firemen; the International Brotherhood of Teamsters and the International Union of Brewery Workers, but, on the contrary, are hereby re-affirmed.

"Resolved, That within ninety days after the close of this convention a conference shall be held at the headquarters of the American Federation of Labor, the conference to consist of three representatives of the International Brewery Workers, one from the International Engineers, one from Brotherhood of Firemen, one from the Brotherhood of Teamsters, and one member of the Executive Council, the conference to endeavor to effect an agreement regarding jurisdiction, harmony and co-operation of action of the organiza-

the charter of the Brewery Workers Union. was restored, but the resolution expressly reaffirmed the previous decisions of the Federation concerning jurisdiction claims of the Brewery Workers, the Engineers, the Firemen, and the Teamsters, and directed the Executive Council to impose such disciplinary punishment upon the organization responsible for failure to abide by the decision of the Convention, as the judgment of the Executive Council might direct. This action constituted another victory for the Gompers policy of conciliation, but it by no means acknowledged lack of power in the Federation. To the contrary it expressly reaffirmed the decisions previously made, and by necessary implication the power to make them.

Moreover, as the restoration of the charter was made with the express reaffirmation of previous decisions concerning membership jurisdiction, and as it occurred after the adoption of the amendments to Section 11, Article IX, and Section 11, Article III, it is doubly clear that after 1907 the Brewery Workers Union was subject to the rules and decisions of the American Federation of Labor concerning membership jurisdiction.

Following the 1907 Convention the Teamsters, Engineers and Firemen informed the Brewery Workers of their willingness to abide by the decision of the 1905 and 1906 Conventions, but the representatives of the Brewers "stated positively that no agreement could be reached on the basis of that decision." Nevertheless, the Executive Council restored the charter of the Brewery Workers and in the communication transmitting it, said, over the signature of President Gompers: "In restoring this charter to the International Union of United Brewery Workmen, it in no wise modifies or changes the decision of the Convention of the American Federation of Labor as to claims of jurisdiction. The duty imposed upon the Executive Council of disciplinary punishment to any organization violating the decision of the Convention of the American Federation of Labor is not changed or modified by the restoration of this charter to your organization."

At its 1908 Convention, the Executive Council reported to the Federation that the conflict had not yet been settled, but that steps had been taken toward adjustment of the dispute as it concerned the Brewery Workers and the Engineers. At the 1909 Convention, the Council reported an agreement between the Brewery Workers and the Engineers. At this Convention, also, the Teamsters Union requested the Convention to grant to it jurisdiction over all chauffeurs and stablemen, and to change its name accordingly.

At the 1911 Convention, the whole question of jurisdiction over teamsters and chauffeurs, including such workers in the new soft drink industry, was referred to the Executive Council. At the 1912 Convention, the proceedings state that the jurisdictional controversy between the Teamsters and the Brewers should be adjusted under the direction of President Gompers and that failing such adjustment, the "Executive Council should render a decision setting forth clearly the jurisdiction of each organization." The Council reported to the 1913 Convention that efforts at adjustment were unsuccessful, hence that it had given its decision in favor of the Brewers. This decision, which was inconsistent with the Federation's decisions of the preceding thirteen years, was adopted by the Convention. This was an assertion, by exercise, of the power to decide such questions.

In 1915,[48] the Teamsters Union and the Brewery Workers Union entered into a compromise agreement,[49] which bears no

---

tions in interest and for the protection and promotion of the interests of the workers employed in and by breweries.

"Resolved, That in the event of an agreement, or a tentative agreement, being reached the officers of the organizations named shall submit the same to their respective International Unions for ratification under the supervision of the representative of the Executive Council, who shall in that circular urge its ratification and give his reasons therefor.

"Resolved, That if the conference shall fail to reach an agreement *the Executive Council is hereby authorized and directed to impose such disciplinary punishment*

upon the organization responsible for such failure, as the judgment of the Executive Council may direct." [Italics supplied]

[48] Although no date appears on the agreement itself, the parties agree, on brief, that it was executed on February 15, 1915.

[49] "Agreement between the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America, and the International Union of United Brewery Workmen of America.

"In order to settle past jurisdiction disputes and for the purpose of a future working agreement between the members

date and specifies no term of duration. By this agreement the Teamsters conceded the jurisdiction of the Brewery Workers Union over drivers, chauffeurs and stablemen employed in the delivery of products of breweries, agencies or beer bottling establishments.

In 1915, the Executive Council reported to the Federation that "Jurisdiction over the drivers of brewery wagons was recognized as belonging to the United Brewery Workers." The Brewery Workers Union contends that the 1915 agreement has been in force for twenty-five years. The Teamsters Union contends that it was violated by the Brewery Workers Union and terminated by the Teamsters long before the jurisdictional dispute was reopened in 1933. In any event, the American Federation of Labor took no further action on the subject until 1933. The coincidence of the period during which the Eighteenth Amendment was in effect, perhaps, explains the quiescence of inter-union conflict. The repeal of the Eighteenth Amendment by the adoption of the Twenty-First Amendment, perhaps, explains the sudden reopening of the conflict. Thereafter, in 1933, the question was again presented to the Federation and

decided in favor of the Teamsters Union. This decision was reaffirmed in 1935.

The lower court concluded: "That the International Working Agreement entered into between the Brewery Workers Union and the Teamsters Union on February 15, 1915, is a binding agreement between the parties and establishes its [sic] respective rights. That the American Federation of Labor, under its Constitution, is required to recognize an agreement of this character between two of its member International Unions, such agreement being entered into under the autonomous rights of the said National or International Unions." In so concluding, the court erred.

Appellees assert the applicable, general rule of law to be that a contract which fixes no period of duration, and which by its inherent nature does not imply a power of revocation, is terminable only by mutual consent, but if by its nature it is not deemed to be perpetual it is terminable at will by either party on reasonable notice.

Careful analysis of the cases cited which declare and apply this proposition will quickly reveal by contrast that the 1915 agreement, here involved, is not one of a non-terminable character.[50] In Western

---

of the above two organizations, the following shall be considered a line of demarkation and a basis of adjustment.

"1. The Drivers, Chauffeurs, and Stablemen employed in the delivery of the products of Breweries, Agencies or Beer Bottling establishments, shall come under the jurisdiction of the International Union of United Brewery Workmen of America.

"2. All men employed in these capacities and now members of the International Brotherhood of Teamsters shall have the right to transfer without restriction or restraint from their International or Local Union to the International Union of United Brewery Workmen.

"3. All the Drivers, Chauffeurs and Stablemen employed in Bottling Establishments where soda and mineral water are bottled exclusively, and not in connection with beer, shall come under the jurisdiction of the International Brotherhood of Teamsters.

"4. All men employed in the above capacity and now members of the International Union of United Brewery Workmen of America, shall have the right to transfer without restriction or restraint from their International or Local Union to the Brotherhood of Teamsters, Chauffeurs and Stablemen.

"5. The International Brotherhood of

Teamsters agrees that in those localities where both organizations have men in the delivery of Mineral and Soda Water, wage agreements on an equal basis shall be submitted to the respective employers and that local conferences be held for that purpose.

"6. Both organizations hereby agree when exclusive soda and mineral water bottling shops are organized in the future, the men employed on the inside shall come under the jurisdiction of the Brewery Workers' International Union and the men in the delivery under the jurisdiction of the International Brotherhood of Teamsters.

"7. The Brewery Workers' International Union agrees to use its best efforts to have all their Local Unions urge their employers to give all extra hauling and teaming only to the firms employing members of the Brotherhood of Teamsters."

[50] Rossmassler v. Spielberger, 270 Pa. 30, 112 A. 876 (defendant acquired the stock of a corporation under an agreement that he should pay the sellers, the shareholders, an agreed sum annually, before payment of any dividends); Western Union Telegraph Co. v. Pennsylvania Co., 3 Cir., 129 F. 849, 68 L.R.A. 968 (contract between the railroad company and the telegraph company for joint construction, maintenance and operation of

telegraph line along right of way of railroad company under which the telegraph company made large investments and sent railroad company messages free over a long period of time, conferred an interest in the nature of an easement on the telegraph company, not revocable at will of the railroad company); Andrews v. Richards, 116 Kan. 344, 226 P. 793 (the dictum in this case merely states the general rule. The oral contract there involved was held unenforceable under the statute of frauds).

[51] 3 Cir., 129 F. 849, 861, 68 L.R.A. 968.

[52] See Jones v. Newport News & M. V. Co., 6 Cir., 65 F. 736, 741.

[53] Norris-LaGuardia Act of March 23, 1932, 47 Stat. 70, 29 U.S.C.A. §§ 101 et seq.; National Labor Relations Act of July 5, 1935, 49 Stat. 449, 29 U.S.C.A. §§ 151 et seq.

[54] Texas & Pacific R. Co. v. Marshall, 136 U.S. 393, 405, 10 S.Ct. 846, 849, 34 L.Ed. 385: "But we are further of opinion that, if the contract is to be construed as the appellant insists it should be construed, it is not one to be enforced in equity. We have already shown that to decree the specific enforcement of this contract is to impose upon the company an obligation, without limit of time, to keep its principal office of business at the city of Marshall, to keep its main machine shops there, and its car works there, and its other principal offices there, although the exigencies of railroad business in the state of Texas may imperatively demand that these establishments, or some of them, should be removed to places other than the city of Marshall, and that this would be also required by the convenience of the public, in which case both the public convenience and the best interests of the railroad company would be sacrificed by a contract which is perpetual, that all of its business offices and business shall forever remain at Marshall." Meyer v. Christ Church, 154 S.C. 415, 151 S.E. 741; Jones v. Newport News & M. V. Co., 6 Cir., 65 F. 736, 742.

Union Telegraph Co. v. Pennsylvania Co.,[51] upon which appellees place great reliance, the court stated the rule as follows: "If a contract is not revocable at the will of either party, or otherwise limited as to its duration, by its express terms, *or by the inherent nature of the contract itself, with reference to its subject-matter or its parties,* it is presumably intended to be permanent and perpetual in the obligation it imposes." [Italics supplied]

■ Whether or not the agreement was a mere working adjustment without binding contractual character or, on the other hand, had contractually binding effect, it could not have such effect as against the power of the association to make a determination contrary to that reached in the agreement and in any event as between the unions *directly* parties to the agreement for longer than a reasonable time. The Brewery Workers Union had, for more than ten years, continued to bring its jurisdictional disputes to the Federation following adverse decisions, to some of which it had agreed in advance to be bound whatever the decisions might be. The trade autonomy of the Teamsters was violated by the 1913 decision of the Federation, as was the constitutionally declared and theretofore consistently maintained principle of the Federation. Considerations, both of subject matter and of parties, therefore, are persuasive that the contract was not intended to be permanent and that the contract by reason of its inherent nature was terminable.[52]

The error of the contrary contention is further demonstrated by the history of technological developments which have produced constant changes in the organization of American industries. The essence of modern industrial economy is its ability quickly to adapt itself to such changes.

The historical facts above mentioned have caused increasing legislation in the field of labor relations, culminating in the Norris-LaGuardia Act and the Wagner Act. In each of these the public policy is declared to be that workers shall have full freedom of association, self-organization and designation of representatives.[53] This could not be achieved if a mere working agreement, set up as a basis of negotiation and adjustment, were permitted to be crystallized, by injunction, into permanent and perpetual form. For this reason, also, the determination of the lower court was erroneous.[54]

■ Finally, whatever its virtues or defects, this agreement of 1915 neither extended nor diminished the obligations of the parent organization toward its affiliates; nor limited its delegated powers over membership jurisdiction, when the question was again presented for its determination. Nothing in the constitution of the Federation, or in the charters of the affiliates, provides that such an agreement can limit the constitutional powers of the Federation. The absurdity of such a result becomes apparent when consideration is given to the

large objectives of that Federation as set out in its constitution, and when it is remembered that there are over one hundred affiliates, which might be affected by collusive agreements between two or more, intended to limit the rights, powers and privileges of others by thus limiting the powers of the parent Federation.

 Upon analysis of the applicable law and consideration of the facts, our conclusion, therefore, is that the American Federation of Labor acted within the scope of its delegated constitutional power,[55] and that no contractual or other rights of the Brewery Workers Union were violated by its decision of 1933. This being true, there is no foundation for equitable relief, or reason for judicial interference, as regards any proper action by the Federation or the Teamsters Union in carrying out that decision.[56] As we have already pointed out, no sufficient showing has been made to warrant the decision of the lower court, in view of the provisions of the Norris-LaGuardia Act. It is not necessary to speculate upon whether a sufficient showing could be made upon new pleadings and a new trial. In any event, the injunction granted by the lower court was too broad in its terms.[57] It enjoined the former from notifying employers, drivers, central labor bodies, state federations of labor, or other interested parties, of its action in transferring jurisdiction of beer drivers from the Brewery Workers Union to the Teamsters Union; in other words, from performing its normal functions as an international federation of labor unions. It enjoined the Teamsters Union from carrying out, or attempting to carry out, the decision of the Federation *in any manner;* in other words from performing its normal functions as an affiliated international union.[58] But the lower court went farther in the case of the Teamsters Union and specified that it should be enjoined from persuading employers, by any means, lawful or unlawful, and from any effort to prevent or discourage any new collective bargaining agreements with the Brewery Workers Union, on the ground of the decision of the American Federation of Labor. The effect of its decision would be to crystallize labor organizations and collective bargaining agencies according to appellees' mistaken notion of the situation existing in 1887 and would require the American Federation of Labor to guarantee that set-up against all organizations in perpetuity. This would be nothing less than an abrogation of important sections of the National Labor Relations Act,[59] and

---

[55] Cf. American Guild of Musical Artists, Inc. v. Petrillo, 261 App.Div. 272, 24 N.Y.S.2d 854, 858: "It should be borne in mind that both these organizations received their charters from the American Federation of Labor, and it would seem to us that it is, in the first instance, the proper tribunal to solve the difficulties of the parties to this controversy."

[56] Stillwell Theatre, Inc. v. Kaplan, 259 N.Y. 405, 412, 182 N.E. 63, 66, 84 A.L.R. 6, rehearing denied, 260 N.Y. 563, 184 N.E. 93, 84 A.L.R. 6, certiorari denied, 288 U.S. 606, 53 S.Ct. 397, 77 L.Ed. 981: "We would be departing from established precedents if we upheld this injunction. We would thereby give to one labor union an advantage over another by prohibiting the use of peaceful and honest persuasion in matters of economic and social rivalry. This might strike a death blow to legitimate labor activities. It is not within the province of the courts to restrain conduct which is within the allowable area of economic conflict." See 1 Teller, Labor Disputes and Collective Bargaining (1940) §§ 131, 132.

[57] Cf. Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc., 311 U. S. 91, 101-103, 61 S.Ct. 122, 85 L.Ed. 63. See American Federation of Labor v. Bain, Or., 106 P.2d 544, 548 et seq., 130 A.L.R. 1278, and authorities there reviewed. See also, May's Furs and Ready to Wear v. Bauer, 282 N.Y. 331, 342-343, 26 N.E.2d 279, 284, reargument denied, 282 N.Y. 804, 27 N.Ed. 210.

[58] See Jaffe, Inter-Union Disputes in Search of a Forum, 49 Yale L.J. 424, 425, and authorities there cited.

[59] Act of July 5, 1935, 49 Stat. 449, 29 U.S.C.A. § 159(b): "The Board shall decide in each case whether, in order to insure to employees the full benefit of their right to self-organization and to collective bargaining, and otherwise to effectuate the policies of this chapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof."

§ 151: " * * * It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by

gratuitous interference with the normal functions of labor organizations, which that Act and the Norris-LaGuardia Act were designed to prevent.[60]

The judgment is reversed; the injunction is dissolved; and the lower court is instructed to proceed in conformity with this decision.

Reversed.

STEPHENS, Associate Justice:

I concur in the view of the court that the American Federation of Labor had power to determine, and validly determined, in 1933 that teamsters and chauffeurs in the brewery industry came within the jurisdiction of the International Brotherhood of Teamsters and Chauffeurs; and I concur in the view of the court that the case involves a labor dispute within the meaning of that term in the Norris-LaGuardia Act, and in the view that the finding that the public officers charged with the duty to protect complainants' property and property rights were unable to furnish adequate protection against violence is without substantial support in the evidence; and I therefore agree that the injunction ought not to have issued and that the judgment should be reversed.

I disagree, however, with the statement of the court that there must, in order to support jurisdiction under the Norris-LaGuardia Act, be a formal finding that due and personal notice had been given to the chief of the public officials, of the county and city within which unlawful acts have been threatened or committed, charged with the duty to protect complainants' property. I think that if a record showed such notice given, or showed that such chief of public officials had actually appeared and testified in the case, the requirement of the statute would be satisfied even though there was no formal finding.

I disagree also with the implication in the decision of the court to the effect that if the findings of fact required by the Norris-LaGuardia Act were insufficient, when filed, to warrant the issuance of an injunction, they could not thereafter be amended so as to make them sufficient. Rule 52(b) of the Federal Rules of Civil Procedure for the District Courts of the United States permits the amendment of findings. By this I do not mean to suggest that a trial court should issue an injunction without sufficient findings; but in my view, if it should improvidently so do, so that the injunction was invalid, it would not thereby be disabled later to make proper findings and thus to validate the injunction from the time the valid findings were made.

workers of *full freedom of association, self-organization, and designation of representatives* of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." [Italics supplied]

§ 157: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

[60] Cf. May's Furs and Ready to Wear, Inc. v. Bauer, 282 N.Y. 331, 343, 26 N.E.2d 279, 285, reargument denied, 282 N.Y. 804, 27 N.E.2d 210: "It is not the function of courts to supervise labor controversies." Cf. also, United States v. Hutcheson, 61 S.Ct. 463, 465, 85 L.Ed. —: "It was widely believed that into the Clayton Act courts read the very beliefs which that Act was designed to remove. Specifically the courts restricted the scope of § 20 to trade union activities directed against an employer by his own employees. Duplex Printing Press Co. v. Deering, supra. Such a view it was urged, both by powerful judicial dissents and informed lay opinion, misconceived the area of economic conflict that had best be left to economic forces and the pressure of public opinion and not subject to the judgment of courts. * * * Agitation again led to legislation and in 1932 Congress wrote the Norris-LaGuardia Act."